Deborah R. Rosenthal (#184241)
drosenthal@simmonsfirm.com
**SIMMONS BROWDER GIANARIS**
**ANGELIDES & BARNERD LLC**
455 Market Street, Suite 1150
San Francisco, California 94105
Phone: (415) 536-3986
Fax: (415) 537-4120

Derek Y. Brandt *
dbrandt@simmonsfirm.com
**SIMMONS BROWDER GIANARIS**
**ANGELIDES & BARNERD LLC**
One Court Street
Alton, Illinois 62002
Phone: (618) 259-2222
Fax: (618) 259-2251

Drew E. Pomerance (#101239)
dep@rpnalaw.com
Nicholas P. Roxborough (#113540)
npr@rpnalaw.com
**ROXBOROUGH POMERANCE NYE & ADREANI**
5820 Canoga Ave., Suite 250
Woodland Hills, California 91367
Phone: (818) 992-9999 / Fax: (818) 992-9991

*Application *pro hac vice* to be submitted
Additional Counsel listed on signature page

FILED
OCT 08 2013
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

*Attorneys for Plaintiffs Franjo, Inc., DMS Facility Services, Inc., and all others
similarly situated*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

FRANJO, INC., and DMS FACILITY
SERVICES, INC., individually and on
behalf of all others similarly situated,

Plaintiffs,

v.

AMERICAN INTERNATIONAL
GROUP, INC.; AIU INSURANCE
COMPANY; AMERICAN FUJI FIRE
AND MARINE INSURANCE
COMPANY; AMERICAN HOME
ASSURANCE COMPANY;
CHARTIS PROPERTY CASUALTY
COMPANY f/k/a AIG CASUALTY
COMPANY f/k/a BIRMINGHAM FIRE
INSURANCE COMPANY OF
PENNSYLVANIA; COMMERCE AND
INDUSTRY INSURANCE COMPANY,
INC.; GRANITE STATE INSURANCE
COMPANY; INSURANCE COMPANY

Case No.: **CV 13 4685**

Judge:

## CLASS ACTION COMPLAINT

1. RICO – VIOLATION OF 18 U.S.C. § 1962(c)
2. RICO – VIOLATION OF 18 U.S.C. § 1962(d)
3. COMMON LAW FRAUD
4. NEGLIGENT MISREPRESENTATION
5. VIOLATION OF UNFAIR BUSINESS PRACTICES ACT [Cal. Bus. & Prof. Code § 17200, *et seq.*]
6. UNJUST ENRICHMENT

## DEMAND FOR JURY TRIAL

-1-

1  OF THE STATE OF PENNSYLVANIA;
   NATIONAL UNION FIRE
2  INSURANCE COMPANY OF
   PITTSBURGH, PA; NEW
3  HAMPSHIRE INSURANCE
4  COMPANY; AIG RISK
   MANAGEMENT INC., MAURICE R.
5  GREENBERG; and DOES 1 through 10
6  inclusive,

7          Defendants.

8

9
                        **INTRODUCTION**
10
      1.    This is a class action brought by California employers seeking
11
   restitution, disgorgement, compensatory, punitive, and treble damages, a
12
   constructive trust, and injunctive relief arising from Defendants' long-term,
13
   unlawful, and fraudulent underreporting of workers' compensation ("WC")
14
   insurance premium, evasion of related financial obligations, and abuse of their
15
   statutory, regulatory, common law, and fiduciary responsibilities with regard to WC
16
   policies issued to businesses that employ workers in the State of California. By
17
   engaging in a systematic underreporting of WC premiums written, Defendants not
18
   only wrongly enriched themselves in various ways, but their systematic practice of
19
   underreporting WC premium caused plaintiffs and other WC policyholders in
20
   California to pay improperly inflated state insurance surcharges and to suffer other
21
   damage. Defendants have admitted to substantially all of the conduct giving rise to
22
   the claims asserted herein.
23
      2.    Plaintiffs, for themselves and all others similarly situated ("Class
24
   Members"), bring this action pursuant to the Racketeering Influenced Corrupt
25
   Organizations Act (18 U.S.C. §§ 1962 *et seq.*) ("RICO") and California's Unfair
26
   Business Practices Act (Cal. Bus. & Prof. Code §§ 17200 *et seq.*) ("UCL").
27
   Plaintiffs also assert claims for common law fraud, negligent misrepresentation, and
28
   unjust enrichment.

                              -2-

1 maintained multiple sets of financial books and records. They maintained an
2 accurate set of books and records that tracked the amount of WC premium they
3 collected from their policyholders, as well as the actual amount of state-mandated
4 pass-through surcharges that they collected from their policyholders. They
5 maintained a false set of books and records that tracked the inaccurate, lesser
6 amount of WC premium that they reported to California state regulators, as well as
7 the lesser amount of aggregate SPF surcharges, which they had collected from their
8 policyholders, that they then remitted to state regulators. Only the false set of books
9 and records were made available to state auditors.

10     42.   Defendants remitted to the state only that amount of the policyholder
11 surcharges that the state expected to receive based on Defendants' falsely
12 underreported WC insurance premium. Defendants wrongfully retained the
13 difference between the higher aggregate amount collected from policyholders and
14 the lower amount remitted to the states. Using the example above, if Defendants
15 had underreported that they collected $75 million of WC premium in a year when
16 they actually collected $100 million, and state regulators levied a guaranty fund
17 surcharge of 1.3 percent for that year based on the inaccurate total amount of
18 reported premium across all insurers, Defendants would pass-through the inflated
19 percentage to their policyholders and thereby receive $1.3 million from their
20 collective policyholders as payment of the guaranty fund surcharge that year (1.3
21 percent of $100 million); but the state would expect to receive only $975,000 from
22 Defendants in guaranty fund surcharges for that year (1.3 percent of the $75 million
23 in WC premium that Defendants had reported collecting). Thus, Defendants
24 remitted only $975,000 to the state and kept the difference—in this example,
25 $325,000—so that state regulators were not tipped off to the premium
26 underreporting by virtue of a mis-match between the aggregate amount of
27 surcharges actually collected by WC insurers and the aggregate amount of
28 surcharges that the state expected would be collected by WC insurers based on the

-13-

1  OF THE STATE OF PENNSYLVANIA;
   NATIONAL UNION FIRE
2  INSURANCE COMPANY OF
   PITTSBURGH, PA; NEW
3  HAMPSHIRE INSURANCE
4  COMPANY; AIG RISK
   MANAGEMENT INC., MAURICE R.
5  GREENBERG; and DOES 1 through 10
6  inclusive,

7          Defendants.

8

9

10                    **INTRODUCTION**

11      1.    This is a class action brought by California employers seeking

12  restitution, disgorgement, compensatory, punitive, and treble damages, a

13  constructive trust, and injunctive relief arising from Defendants' long-term,

14  unlawful, and fraudulent underreporting of workers' compensation ("WC")

15  insurance premium, evasion of related financial obligations, and abuse of their

16  statutory, regulatory, common law, and fiduciary responsibilities with regard to WC

17  policies issued to businesses that employ workers in the State of California. By

18  engaging in a systematic underreporting of WC premiums written, Defendants not

19  only wrongly enriched themselves in various ways, but their systematic practice of

20  underreporting WC premium caused plaintiffs and other WC policyholders in

21  California to pay improperly inflated state insurance surcharges and to suffer other

22  damage. Defendants have admitted to substantially all of the conduct giving rise to

23  the claims asserted herein.

24      2.    Plaintiffs, for themselves and all others similarly situated ("Class

25  Members"), bring this action pursuant to the Racketeering Influenced Corrupt

26  Organizations Act (18 U.S.C. §§ 1962 *et seq.*) ("RICO") and California's Unfair

27  Business Practices Act (Cal. Bus. & Prof. Code §§ 17200 *et seq.*) ("UCL").

28  Plaintiffs also assert claims for common law fraud, negligent misrepresentation, and
    unjust enrichment.

                              -2-

1

## JURISDICTION AND VENUE

2   3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331
3   in that Plaintiffs' claims arise under the laws of the United States, including without
4   limitation, RICO, 18 U.S.C. § 1964.

5   4.     Subject matter jurisdiction also exists pursuant to the Class Action
6   Fairness Act of 2005 (28 U.S.C. § 1332(d)), because at least one class member is of
7   diverse citizenship from one Defendant; there are more than 100 class members;
8   and the aggregate amount in controversy exceeds $5,000,000.

9   5.     This Court has supplemental jurisdiction over the state law claims
10  pursuant to 28 U.S.C. § 1367.

11  6.     Venue is proper in this District because a substantial part of the events
12  giving rise to Plaintiffs' claims occurred in this District. 28 U.S.C. § 1391(b)(2).
13  Venue also is proper because Defendants reside in this District, are found in this
14  District, have an agent in this District, transact affairs in this District, and/or the
15  ends of justice require that any parties residing in other districts be brought before
16  this District Court.

17  7.     In connection with the acts and omissions alleged in this Complaint,
18  Defendants, directly or indirectly, used the means and instrumentalities of interstate
19  commerce, including without limitation, the mails, interstate telephone
20  communications, the Internet, and the facilities of the national securities markets
21  and exchanges.

22  ## PARTIES AND RELEVANT ENTITIES

23  **Plaintiffs**

24  8.     Plaintiff Franjo, Inc. ("Franjo") is a California corporation with its
25  principal place of business in Fresno, California. Franjo operates occupational
26  medical clinics in the Fresno area. From approximately 1994 through the present,
27  Franjo has employed between 12 and 27 California workers and was required under
28  California law to have in effect a policy of WC insurance that would cover the

1  potential work-related injury claims of its California workers. During this
2  timeframe, Franjo purchased WC insurance from different insurers as further
3  described below.

4      9.    Plaintiff DMS Facility Services, Inc. ("DMS") is a California
5  corporation with its principal place of business in Monrovia, California. From
6  approximately 1967 through the present, DMS has operated in the business of
7  building services, providing janitorial services, maintenance, landscaping, facilities
8  engineering and other services to multi-tenant office buildings, large corporate
9  campuses, government buildings, schools, and financial institutions. DMS presently
10  employs approximately 1,900 California workers and has employed as many as
11  3,000 California workers. DMS is and has been required under California law to
12  have in effect a policy of WC insurance that would cover the potential work-related
13  injury claims of its California workers. During this timeframe, DMS purchased WC
14  insurance from different insurers as further described below.

15      10.    Each plaintiff brings this action on its own behalf and as a
16  representative of a class of individuals and entities similarly situated.

17  **Defendants**

18      11.    Defendant American International Group, Inc. ("AIG") is a Delaware
19  corporation with its principal place of business in New York. AIG is a publicly-
20  traded holding company which, through its subsidiaries and affiliates, engages in a
21  broad range of financial and insurance-related activities in the United States and
22  throughout the world. AIG, through its subsidiaries and affiliates, is the largest
23  underwriter of commercial and industrial insurance in the U.S.

24      12.    AIG directs and controls, and at all times material to this Complaint
25  directed and controlled, the activities of its affiliates and subsidiaries ("AIG
26  Companies"), which collectively have been considered by the National Association
27  of Insurance Commissioners as the "AIG Group," or "NAIC Group # 0012." As
28  used in this Complaint, "AIG Group" refers collectively to AIG and AIG

1    Companies.

2        13.    Defendant American Home Assurance Company ("AHAC"), formerly

3    known as American Home Fire Assurance Company, is a New York corporation

4    with its principal place of business in New York. It is, and at all times material to

5    this Complaint was, a subsidiary and/or affiliate of AIG. It is an AIG Company as

6    that term is used in this Complaint. During the relevant years, AHAC, its alternate

7    entities, and each of them, were licensed to transact WC insurance business in the

8    State of California, and did transact such business, issuing policies to members of

9    the Class.

10       14.    Defendant AIU Insurance Company ("AIU"), formerly known as

11   American International Insurance Company, is a New York corporation with its

12   principal place of business in New York. It is, and at all times material to this

13   Complaint was, a subsidiary and/or affiliate of AIG. It is an AIG Company as that

14   term is used in this Complaint.  During the relevant years, AIU, its alternate

15   entities, and each of them, were licensed to transact WC insurance business in the

16   State of California, and did transact such business, issuing policies to members of

17   the Class.

18       15.    Defendant American Fuji Fire and Marine Insurance Company

19   ("AFF") was incorporated in Illinois and was, at all times material to this

20   Complaint, a subsidiary and/or affiliate of AIG. It is an AIG Company as that term

21   is used in this Complaint. Beginning in approximately 1991 and continuing until at

22   least 2012, AFF, its alternate entities, and each of them, were licensed to transact

23   WC insurance business in the State of California, and did transact such business,

24   issuing policies to members of the Class.

25       16.    Defendant Chartis Property Casualty Company ("CPC"), formerly

26   known as AIG Casualty Company and/or Birmingham Fire Insurance Company of

27   Pennsylvania, is a Pennsylvania corporation with its principal place of business in

28   New York. It is, and at all times material to this Complaint was, a subsidiary and/or

1   affiliate of AIG. It is an AIG Company as that term is used in this Complaint.
2   During the relevant years, CPC, its alternate entities, and each of them, were
3   licensed to transact WC insurance business in the State of California, and did
4   transact such business, issuing policies to members of the Class.

5       17.    Defendant Commerce and Industry Insurance Company ("CII") is a
6   New York corporation with its principal place of business in New York. It is, and at
7   all times material to this Complaint was, a subsidiary and/or affiliate of AIG. It is
8   an AIG Company as that term is used in this Complaint. During the relevant years,
9   CII, its alternate entities, and each of them, were licensed to transact WC insurance
10  business in the State of California, and did transact such business, issuing policies
11  to members of the Class.

12      18.    Defendant Granite State Insurance Company ("GSI"), formerly known
13  as Granite State Fire Insurance Company, is a Pennsylvania corporation with its
14  principal place of business in New York. It is, and at all times material to this
15  Complaint was, a subsidiary and/or affiliate of AIG. It is an AIG Company as that
16  term is used in this Complaint. During the relevant years, Granite State Insurance
17  Company, its alternate entities, and each of them, were licensed to transact WC
18  insurance business in the State of California, and did transact such business, issuing
19  policies to members of the Class.

20      19.    Defendant Insurance Company of the State of Pennsylvania ("ICP") is
21  a Pennsylvania corporation with its principal place of business in New York, New
22  York. It is, and at all times material to this Complaint was, a subsidiary and/or
23  affiliate of AIG. It is an AIG Company as that term is used in this Complaint.
24  During the relevant years, ICP, its alternate entities, and each of them, were
25  licensed to transact WC insurance business in the State of California, and did
26  transact such business, issuing policies to members of the Class.

27      20.    Defendant National Union Fire Insurance Company of Pittsburgh, PA
28  ("NUF"), is a Pennsylvania corporation with its principal place of business in New

-6-

1  York, New York. It is, and at all times material to this Complaint was, a subsidiary
2  and/or affiliate of AIG. It is an AIG Company as that term is used in this
3  Complaint. During the relevant years, NUF, PA, its alternate entities, and each of
4  them, were licensed to transact WC insurance business in the State of California,
5  and did transact such business, issuing policies to members of the Class.

6      21.    Defendant New Hampshire Insurance Company ("NHI"), formerly
7  known as New Hampshire Fire Insurance Company, is a Pennsylvania corporation
8  with its principal place of business in New York. It is, and at all times herein
9  relevant was, a subsidiary and/or affiliate of AIG. It is an AIG Company as that
10 term is used in this Complaint. During the relevant years, NHI, its alternate entities,
11 and each of them, were licensed to transact WC insurance business in the State of
12 California, and did transact such business, issuing policies to members of the Class.

13     22.    AIG Risk Management, Inc. ("AIG-RMI") is a New York corporation
14 with its principal place of business in New York. It was a subsidiary and/or affiliate
15 of AIG and CPC. It is an AIG Company as that term is used in this Complaint.
16 During the relevant years, AIG-RMI, its alternate entities, and each of them, were
17 the underwriting arm of AIG.

18     23.    AIG Companies have been major participants in the California WC
19 market for decades.

20     24.    Defendant Maurice R. Greenberg ("Greenberg") is an individual
21 residing in Key Largo, Florida. Greenberg joined AIG in approximately 1967 and
22 served as the Chairman and Chief Executive of AIG until his forced resignation in
23 March 2005. In his capacity as head of AIG, Greenberg was responsible for
24 conducting the business operations of AIG and the AIG Companies. He
25 orchestrated and carried out the false reporting schemes that give rise to this civil
26 action. Greenberg is the Chairman and CEO of C.V. Starr & Co., Inc., further
27 described below.

28

**Other Relevant Individuals and Entities**

25.     Thomas R. Tizzio ("Tizzio") is an individual residing in Middletown, New Jersey. Tizzio joined AIG in approximately 1967 and served as a director on its board from 1986 to 2006 approximately. He has held numerous management roles, including Senior Vice Chairman of General Insurance at AIG, Chairman of AIU, and, from 1991 to 1997, AIG President. In those and other capacities, Tizzio was responsible for conducting the business operations of AIG and the AIG Companies. He orchestrated and carried out the false reporting schemes that give rise to this civil action.

26.     Richard L. Thomas ("Thomas") managed AIG's Office of Workers' Compensation prior to 1996 and subsequently served as a Senior Vice President and Chief Underwriting Officer. In those and other capacities, Thomas was responsible for conducting the business operations of AIG and the AIG Companies. He orchestrated and carried out the false reporting schemes that give rise to this civil action.

27.     Joseph C. Smetana ("Smetana") is an individual residing in Rockville Centre, New York. Smetana is a former President and Chairman of AIG-RMI. During one or more of the relevant years, he also served as Chairman of the Commercial Lines Division of AIU. In those and other capacities, Smetana was responsible for conducting the business operations of AIG and the AIG Companies. He orchestratied and carried out the false reporting schemes that give rise to this civil action.

28.     Tizzio, Thomas, and Smetana are collectively referred to hereafter as the "Other Senior Managers."

29.     C.V. Starr & Co., Inc. ("CVSCO") is an investment holding company organized and existing under the laws of Delaware with its principal place of business in New York, New York. Although founded by Cornelius Vander Starr, who also founded AIG, AIG has never had any ownership interest in CVSCO at any

1  time material to this Complaint. At all times material to this Complaint, CVSCO
2  was a minority shareholder in AIG. Until at least 2005, CVSCO's business
3  activities were conducted by individuals who were officers and/or directors of AIG
4  and/or AIG Companies.

5      30.    Starr International Company, Inc. ("SICO") is a corporation organized
6  and existing under the laws of Panama, with a principal place of business in
7  Bermuda. Although founded by Cornelius Vander Starr, who also founded AIG,
8  AIG has never had any ownership interest in SICO at any time material to this
9  Complaint. At all times material to this Complaint, SICO was a minority
10  shareholder in AIG. Until at least 2005, SICO's business activities were conducted
11  by individuals who were officers and/or directors of AIG and/or AIG Companies.

12                    **FACTS PERTAINING TO ALL CLAIMS**
13  **Funding of State WC Insurance Programs**

14      31.    The WC insurance market is, in many states, comprised generally of
15  two sub-markets: the "voluntary" market and the "residual" market. The voluntary
16  market provides coverage for companies that are able to purchase WC insurance in
17  the open market. Some higher risk companies are unable to secure WC insurance in
18  the open market (because, for example, their work is particularly dangerous or they
19  have a poor loss record); those companies typically obtain WC insurance in the
20  residual market, which in many states is also referred to as the "assigned risk"
21  market. In such states, insurers that participate in the voluntary market are required
22  by law to participate in the residual market, where the obligation to insure a
23  particular company may be "assigned" to an insurer, under rates and terms specified
24  by law. Through certain state- or industry-run pooling arrangements, some of the
25  cost of providing insurance to the residual market is allocated to the voluntary
26  market to ensure that companies can obtain assigned risk coverage if necessary.
27  This system is predicated on voluntary market insurers acting truthfully in their
28  disclosure of annual WC premium and other financial reporting. In other states,

1   such as California, the residual market is covered by a state-run or –mandated Fund,

2   which functions as a competitor to the commercial insurance companies offering

3   workers' compensation coverage in that state. In California, the residual market is

4   covered by the State Compensation Insurance Fund ("SCIF"), a self-supporting

5   non-profit public enterprise fund.

6       32.    State insurance regulators require insurers to report the amount of WC

7   insurance premium (and other types of insurance premium) that the insurers write

8   in the state. Many states use this data in order to allocate the costs of the residual

9   market and pass those costs along to the insurers that participate in the voluntary

10   market.

11       33.    Many states, including California, use the insurers' disclosure of WC

12   premium and financial reporting in another way. These states administer certain

13   special purpose funds – such as guaranty funds, fraud investigation funds, and the

14   like. In some states, including California, the state pays for some or all of the cost

15   of administering these funds by way of direct pass-through surcharges or

16   assessments made on policyholders.

17       34.    To administer the special purpose funds that are financed through

18   surcharges or assessments passed through directly to policyholders (hereafter,

19   "SPFs"), state insurance regulators aggregate WC insurers' premium data to

20   determine the total amount of WC insurance written in the state for a given year.

21   They then compare that total to the amount of money necessary to fund the SPFs in

22   question, calculating what percentage of the aggregate WC insurance written in the

23   state this amount equates to. Thereafter, regulators instruct insurers to pass through

24   to policyholders an assessment or surcharge equivalent to that percentage of the

25   policyholder's premium. In this way, each policyholder in the state pays its own

26   *pro rata* share of funding the SPFs.

27       35.    For example, if a state has a WC insurance guaranty fund and state

28   regulators know that they need $1 million to operate that fund, and they know that

-10-

1    all private insurers wrote an aggregate premium amount of $100 million in WC

2    insurance in the state the prior year, they would determine that they need to institute

3    a 1 percent surcharge or assessment on all policyholders for the coming year. In this

4    example, the state regulators would instruct insurers in the private market, as well

5    as the SCIF, to add to each policyholder's invoice a line-item surcharge equivalent

6    to 1 percent of the policyholder's WC insurance premium, as the guaranty fund

7    surcharge. The insurers collect this surcharge as a part of their invoicing process

8    and remit the surcharge to the appropriate state officials.

9          36.     If an insurer provides the state inaccurate information about the

10   amount of WC insurance premium it writes in the state, the state's calculations will

11   be skewed. For instance, if an insurer underreports the amount of WC insurance it

12   writes in the state, this would inflate the direct pass-through surcharge or

13   assessment percentage that the state perceives is necessary to fund SPFs. In the

14   example above, if a WC insurer falsely reported that it collected $25 million less in

15   premium than it actually collected, the state regulators would still need $1 million

16   to operate their guaranty fund; but, incorrectly believing that all private insurers and

17   SCIF wrote an aggregate premium of $75 million in the state (rather than the $100

18   million actually written), the regulators would believe that they needed to impose a

19   surcharge of 1.3%, instead of 1%, to cover the cost of administering the guaranty

20   fund. As a result all policyholders in the state would pay an inflated surcharge that

21   year.

22        37.     Defendants knowingly and intentionally provided false financial

23   information to the State of California, including false information about the amount

24   of WC insurance premium written in California. As a direct result, Plaintiffs and

25   Class Members were injured.

26   **AIG Carried Out a Massive WC Insurance Underreporting Fraud Over a Period of Close to 40 Years**

27
28        38.     Beginning in approximately 1970, Defendants devised, implemented,

participated in, and carried out nationwide schemes – later characterized by AIG's

-11-

1    own General Counsel as "permeated with illegality" – to miscategorize, falsely

2    report, and falsely book the AIG Companies' WC premium as other premium (for

3    example, as "general liability" premium), in order to reduce Defendants' expenses,

4    inflate their profits, and unjustly enrich themselves at the expense of Plaintiffs and

5    the Class.

6        39.    Defendants regularly issued falsified certified annual financial reports

7    and other materials that underreported WC premium figures, for the purpose and

8    with the effect of evading AIG's and the AIG Companies' equitable shares of

9    financial responsibility for state-levied taxes and assessments.

10       40.    Defendants' underreporting was fraudulent and had the purpose and

11   effect of misleading state insurance regulators as to both the total amount of WC

12   premium written in a given state and AIG Companies' *pro rata* share of that total.

13   This benefitted Defendants by allowing them to avoid certain premium taxes.

14   Defendants expected and intended that their fraudulent underreporting would also

15   have the effect of causing the state to mis-calculate the percentage surcharges

16   necessary to administer SPFs, and as a direct result, that Plaintiffs and Class

17   Members would pay artificially inflated amounts for the SPFs passed directly

18   through to them. When Defendants underreported premium, policyholders

19   throughout the state paid artificially inflated pass-through surcharges and

20   assessments. This was equally true of individual policyholders insured by

21   Defendants and those insured by Other Insurers alike—each policyholder who

22   purchased WC insurance in California during the years that Defendants

23   underreported the amount of premium that they had collected was subjected to the

24   higher surcharge, calculated by state regulators as the amount necessary to fill the

25   SPF coffers based on the incorrectly reported, lesser amount of aggregate WC

26   premium volume that the Defendants reported.

27       41.    In order to conceal the fraudulent scheme from state regulators, non-

28   AIG-affiliated insurers ("Other Insurers"), and policyholders, Defendants

-12-

1  maintained multiple sets of financial books and records. They maintained an
2  accurate set of books and records that tracked the amount of WC premium they
3  collected from their policyholders, as well as the actual amount of state-mandated
4  pass-through surcharges that they collected from their policyholders. They
5  maintained a false set of books and records that tracked the inaccurate, lesser
6  amount of WC premium that they reported to California state regulators, as well as
7  the lesser amount of aggregate SPF surcharges, which they had collected from their
8  policyholder, that they then remitted to state regulators. Only the false set of books
9  and records were made available to state auditors.

10  42.  Defendants remitted to the state only that amount of the policyholder
11  surcharges that the state expected to receive based on Defendants' falsely
12  underreported WC insurance premium. Defendants wrongfully retained the
13  difference between the higher aggregate amount collected from policyholders and
14  the lower amount remitted to the states. Using the example above, if Defendants
15  had underreported that they collected $75 million of WC premium in a year when
16  they actually collected $100 million, and state regulators levied a guaranty fund
17  surcharge of 1.3 percent for that year based on the inaccurate total amount of
18  reported premium across all insurers, Defendants would pass-through the inflated
19  percentage to their policyholders and thereby receive $1.3 million from their
20  collective policyholders as payment of the guaranty fund surcharge that year (1.3
21  percent of $100 million); but the state would expect to receive only $975,000 from
22  Defendants in guaranty fund surcharges for that year (1.3 percent of the $75 million
23  in WC premium that Defendants had reported collecting). Thus, Defendants
24  remitted only $975,000 to the state and kept the difference—in this example,
25  $325,000—so that state regulators were not tipped off to the premium
26  underreporting by virtue of a mis-match between the aggregate amount of
27  surcharges actually collected by WC insurers and the aggregate amount of
28  surcharges that the state expected would be collected by WC insurers based on the

-13-

1  lesser amount of premium that has been reported by Defendants. In this manner,
2  the fraudulent underreporting of WC insurance premium allowed Defendants to not
3  only evade premium taxes they otherwise owed but also to unlawfully profit from
4  the state-mandated surcharges that they levied on their policyholders.

5  43.    As a result of Defendants' underreporting, state regulators assigned to
6  Defendants and to Other Insurers a greater percentage of state assessments than
7  would have been the case if Defendants had been truthful. The higher assessments
8  were directly charged to, and paid by Plaintiffs and Class members. The Other
9  Insurers were ignorant of the fraud, and Plaintiffs and Class members were ignorant
10 of the fraud.

11 44.    Defendants engaged in this misconduct for approximately four decades
12 commencing in approximately 1970 for the purpose of unjustly enriching
13 themselves by evading their fair share of state-levied, workers'-compensation-
14 related taxes and by not remitting to the state the entirety of the Special Purpose
15 Fund surcharges that they collected from their insureds.

16 45.    Defendants' knowing and intentional misreporting caused employers
17 who purchased WC insurance in the State of California to pay more than they
18 legally should have paid, without their knowledge or consent, in violation of state
19 and federal laws.

20 46.    Defendants knowingly and intentionally engaged in these false
21 reporting schemes to gain the unjust benefit these schemes conferred on the
22 Defendants, at the expense of Plaintiffs and the Class. Defendants expected and
23 intended that the AIG Companies' false statements of WC premium would be used
24 as the basis to calculate the Special Purpose Fund assessments levied by the states
25 and paid by policyholders. AIG Companies' underreporting made it appear to state
26 insurance regulators that the total volume of WC premium collected by insurers
27 state-wide was lower than it actually was, and that AIG Companies' proportionate
28 share of the WC insurance market was substantially smaller than it actually was.

-14-

1  Based thereon, state regulators unknowingly inflated the Special Purpose Fund
2  assessments levied on policyholders. Defendants knowingly (and Other Insurers
3  unknowingly) passed along inflated Special Purpose Fund assessments to their
4  policyholders.

5      47.    Defendants expected and intended that these improperly inflated costs
6  would be passed on to policyholders because Defendants were subject to laws
7  mandating that these costs be passed on to policyholders and because Defendants
8  passed along these costs to their own policyholders.

9      48.    Defendants expected and intended that states, including the State of
10  California and its agencies, departments, and regulators, as well as Other Insurers
11  and insured employers doing business in California, all would rely on the accuracy
12  of Defendants' reported data, to the financial detriment of these entities and
13  individuals, yet Defendants continued to perpetrate these fraudulent practices for
14  decades. The State's miscalculations were the intended, foreseeable, and natural
15  consequence of Defendants' fraud.

16      49.    Without knowledge of the fraud, Plaintiffs and the Class Members
17  relied on, complied with, and paid the improperly inflated surcharges passed along
18  to them by their insurers, and Defendants knew that Plaintiffs and the Class would
19  so rely.

20      50.    Defendants formulated and executed these fraudulent acts and
21  omissions under the direction and leadership of Greenberg and other members of
22  AIG's management team. AIG Chairman Greenberg bore direct responsibility for
23  the supervision and oversight of AIG's day-to-day operations, including the
24  fraudulent AIG programs to which AIG has now admitted. He was personally
25  aware of and approved the scheme. The Other Senior Managers also knowingly
26  participated in the fraud, including a cover-up and destruction of relevant evidence
27  described below.

28      51.    Defendants' scheme generated significant financial benefits for

-15-

1  Defendants, including substantially increasing the profits of AIG Companies and,
2  ultimately, of AIG. For their role in fraudulently increasing the profits of
3  Defendants, Greenberg and the Other Senior Managers received substantial
4  compensation, bonuses, and other rewards, above and beyond what they would
5  otherwise have received. For instance, Greenberg, the Other Senior Managers, and
6  the persons responsible for conducting the business operations of AIG Companies
7  received additional compensation, bonuses and other rewards outside the normal
8  course of AIG's business, from the award of interests in or compensation from C.V.
9  Starr & Co. and/or Starr International Company, Inc., third parties that were
10 stockholders of, but were otherwise unrelated to, AIG. This incentivized those
11 individuals to maximize the profitability of AIG, including by use of the WC
12 underreporting scheme.

13      52.     The schemes to defraud Plaintiffs and the Class relied upon the use of
14 the mail. On numerous occasions since approximately 1970 AIG, Greenberg, and
15 the Other Senior Managers knowingly and with the intent to defraud Plaintiffs and
16 the Class, among others, caused and directed AIG Companies to send via the U.S.
17 Mail materially false and misleading financial statements and reports that
18 underreported AIG Companies' WC premium. In addition, on numerous occasions
19 during the relevant years, AIG, Greenberg, and the Other Senior Managers
20 knowingly and with the intent to defraud Plaintiffs and the Class, among others,
21 directed AIG Companies and others to use the U.S. mail and/or wire transmission
22 to send checks or other payment forms that underpaid the AIG Companies' lawful
23 and proper share of Special Purpose Fund assessments owed to the SPFs. Each use
24 of the mail to send falsified premium figures, and each use of the mail and/or wire
25 transmission to send checks or other payment forms, constituted a separate and
26 independent violation of the mail fraud statute and/or the wire fraud statute that
27 occurred in furtherance of the overall scheme to unlawfully profit from the
28 underreporting of WC premium.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**The Fraud in California**

53. Defendants carried out the above-described fraud in the State of California, to the detriment of Plaintiffs and the members of the Class.

54. During the relevant years, AIG Companies operated as WC insurers within the State of California. As part of their privilege to operate within this state, Defendants, and each of them, were and are subject to state statutory and regulatory laws relevant to WC.

55. Subject to the laws of the State of California, the California Department of Industrial Relations ("DIR") levies, and has during all or substantial part of the relevant years levied, on all insurers issuing WC policies in California, assessments in an amount that DIR deems necessary to fund, among other programs, the administration of DIR's Division of Workers' Compensation ("Workers' Compensation Administration Fund," or "WCA"), the Subsequent Injuries Benefits Trust Fund ("SIBT"), and the Uninsured Employers Benefits Trust Fund ("UEBT"). Additionally, the California Department of Insurance ("CDI") levies, and has during all or substantial part of the relevant years levied, on all insurers issuing WC policies in California, assessments in an amount that the CDI deems necessary to fund the budget of the California Workers' Compensation Insurance Fraud Program ("WCFA"). Additionally, the California Insurance Guarantee Association ("CIGA") levies, and has during all or substantial part of the relevant years levied, on all insurers issuing WC policies in California, assessments that CIGA deems necessary to fund CIGA. At least these five programs—WCA, SIBT, UEBT, WCFA, and CIGA—are the SPFs at issue in this action although additional SPFs may also be implicated.

56. Insurers writing WC policies in California are required to file annual financial statements with the CDI that include a report of the aggregate amount of premium that each insurer collected during the preceding calendar year from policyholders who purchased WC coverage in California. DIR, CDI, and CIGA

1  calculate the amount they need to fund their Special Purpose Fund programs, and
2  then determine these annual assessments in part based on the total amount of WC
3  insurance premium that insurers report having collected from California
4  policyholders in the preceding calendar year. DIR, CDI, and CIGA determine how
5  much they need to fund the SPFs in the coming year; divide this amount by the
6  aggregate of net direct written premium that the insurers reported collecting, as
7  shown in the insurers' annual financial statements on file with the California
8  Department of Insurance; and then, based on this formulation, instruct insurers to
9  assess each policyholder a uniform percentage surcharge based on the
10 policyholder's premium.

11     57.    Commencing in approximately 1970 and continuing for approximately
12 the next 40 years, Defendants annually underreported the amount of WC premium
13 they collected in California in the preceding calendar year. By reporting a lower
14 amount of WC premium than they actually had written, Defendants caused
15 insurance regulators to perceive and to believe that the total amount of WC
16 insurance premium that all WC insurers had collected was far less than it actually
17 was. Thus having an apparently smaller pool of money to draw from, DIR, CDI,
18 and CIGA instituted higher percentage surcharges to be levied on policyholders to
19 fund the Special Purpose Fund programs than they would have charged had they
20 known the correct total amount of premium that had been collected.

21     58.    Pursuant to state laws and relevant regulations, as well as industry
22 custom, the insurers, including Defendants, then collected the full cost of these
23 assessments from their policyholders in the form of state-mandated surcharges
24 billed to the policyholders.

25     59.    Defendants knew this was occurring at the time it occurred, because
26 Defendants knew how DIR, CDI, and CIGA calculated the SPF assessments; knew
27 the requirements of the laws mandating pass-through of these costs to
28 policyholders; and knew that they could, and did, profit from the difference

-18-

1 between the aggregate amount of SPF assessments they collected from WC
2 policyholders and the lesser amount of SPF assessments that they remitted to the
3 state. Defendants never disclosed that these overcharges were occurring.

4      60.    Each of the five SPFs described herein existed for all or a substantial
5 part of the approximate four decades of underreporting. Even though DIR, CDI, and
6 CIGA did not levy assessments for each of these five programs every year during
7 the relevant time frame, each time these agencies levied any of these assessments,
8 the insurers surcharged their policyholders uniform percentages as dictated by
9 regulators. Further, each time these agencies levied any of these assessments, the
10 surcharged percentages were improperly and uniformly inflated by Defendants'
11 underreporting.

12      61.    The validity of WC insurance surcharges and premiums billed to the
13 insured employers doing business in California has at all relevant times depended
14 on the honest and truthful and lawful and accurate reporting by insurers of the WC
15 insurance premium they collect. This number is an essential part of the calculations
16 that DIR, CDI, and CIGA make to determine how much to assess policyholders in
17 the form of CIGA, WCA, WCFA, SIBT, and UEBT surcharges.

18      *California Insurance Guarantee Association (CIGA)*

19      62.    California established CIGA by statutory enactment in 1969 for the
20 purpose of assuring that injured persons receive benefits in the event that their
21 insurance carrier(s) become(s) insolvent. CIGA handles, administers, pays, and
22 settles the unpaid claims of insolvent insurers that offer certain lines of insurance in
23 California. Cal. Ins. Code §§ 1063 *et. seq.* (CIGA is sometimes referred to as the
24 "Guaranty Fund.") All insurers admitted to transact any of these lines of insurance
25 in California are required to become a member of CIGA.

26      63.    CIGA annually audits its financial condition and takes steps to assure
27 that it maintains sufficient funds to cover the WC claims of past and possible future
28 insolvent insurers. One of the ways that CIGA obtains funds is by collecting

-19-

1    premium payments from its member insurers in amounts that it estimates are
2    sufficient to discharge its obligations. Payments and obligations are allocated
3    according to line of insurance (WC, homeowners, automobile, etc.). Insurers are
4    required to report the amount of WC premium they collected in the preceding year
5    on an annual financial statement filed with the State Insurance Commissioner. Cal.
6    Ins. Code § 1063.5. CIGA then estimates the amount of funds that the annual audit
7    reveals is needed to cover the WC claims of insolvent insurers and divides that
8    amount by the total amount of "net direct written premium" that all insurers
9    reported collecting in the preceding calendar year. This standard assessment is then
10   levied on policyholders as a uniform percentage of this "net direct written
11   premium."

12       64.    The CIGA surcharge is not levied every year. Moreover, at all times
13   during the relevant years, the CIGA surcharge was capped at either 1% or 2%,
14   depending on the year. So if the State needed to raise more than 1% or 2% to
15   adequately fund CIGA, it would carry over any amount that it needed which
16   exceeded the statutory cap into the following year.

17       65.    In addition to this standard assessment, beginning in or about May
18   2005, CIGA levied an additional bond assessment on policyholders (made through
19   the insurers), to pay off bonds that were sold to the market in the early to mid-
20   2000s. The bond assessment has ranged from .21% to 1.56% since its inception in
21   May 2005, when it was calculated and levied based on the net direct written
22   premium that insurers reported collecting in 2004.

23       66.    Both the CIGA surcharges and the CIGA bond assessments are
24   imposed on and paid by employer-policyholders, and they appear as line items on
25   policyholders' premium declarations.

26       67.    During the years of Defendants' underreporting, policyholders subject
27   to the CIGA surcharge paid either too much in one year, or paid for too many years,
28   due to the improperly inflated percentage that was charged as a result of the State's

-20-

1  reliance upon the false information provided by Defendants regarding the total
2  amount of WC premium that Defendants had collected.

3      68.    Defendants' underreporting caused the Guaranty Fund assessments
4  levied on California policyholders to be inflated during every year that they were
5  levied from 1970 through 2010. As a result, California policyholders, including
6  Plaintiffs and the Class, suffered direct injury by reason of Defendants' fraud.

7      *Workers' Compensation Administration Revolving Fund*

8      69.    The California Legislature established the Workers' Compensation
9  Administration Revolving Fund in 1989 to defray the administrative costs of claims
10 resolution. Each year, the DIR Director determines the amount needed to
11 adequately finance the operations of the Fund for the coming year. Prior to 2003,
12 these administrative costs were financed by taking 80% of what was needed from
13 the State's General Fund and 20% from California policyholders, in the form of a
14 "WCA Surcharge." This same charge was also known by different names, including
15 "User Funding Assessment." The amount that each policyholder paid for this WCA
16 Surcharge thus was calculated as follows: amount needed for WCA Fund,
17 multiplied by .20, and then that figure was divided by the total amount of WC
18 premium that insurers reported collecting from California policyholders in the
19 preceding calendar year. The resulting number was the percentage that DIR
20 assessed each policyholder in that year. Insurers collecting WC premium from
21 employers then multiplied the amount of each individual policyholder's premium
22 by this percentage, and billed the calculated amount to the policyholder as the
23 policyholder's WCA Surcharge for that year.

24     70.    As a result of Defendants' fraud in underreporting the premium they
25 collected each year, the percentages used to assess each individual policyholder to
26 pay for the costs of the WCA Fund was higher than it otherwise would have been.
27 As a result, policyholders, including Plaintiffs and the Class suffered direct injury
28 by reason of Defendants' fraud.

-21-

1

*Workers' Compensation Fraud Assessment ("WCFA") Program*

2      71.    The WCFA program was created in 1992 to ensure benefits for
3 workers with *bona fide* work-related injuries by funding the investigation and
4 prosecution of those who defraud the system. Cal. Ins. Code § 1872.83. All WC
5 policies issued in California since 1992 are subject to a surcharge for this Fund,
6 which is also financed by fines collected from fraud convictions. The Fraud
7 Assessment Commission determines the dollar amount necessary to fund fraud
8 investigation and prosecution each fiscal year and then notifies DIR and/or CDI of
9 the projected amount required for the coming fiscal year. DIR and/or CDI then
10 approves an aggregate amount of assessment and allocates it between self-insured
11 employers and insured employers in proportion to payroll respectively paid in the
12 most recent year for which payroll information is available. Cal. Labor Code § 62.6.
13 The assessment is then paid by self-insurers based on a percentage of indemnity
14 paid during the most recent year for which information is available and by insured
15 employers, including Plaintiffs and the Class, as a percentage of premium. That
16 percentage is calculated in a manner similar to how the CIGA and WCA surcharges
17 are calculated. The surcharge charged to policyholders appears on their bills as
18 "WCFA." The same charge is also described by other names, including "Anti-Fraud
19 Surcharge."

20      72.    California imposed the WCFA surcharge on policyholders who
21 purchased WC policies in this State for at least 12 of the approximate 40 years that
22 AIG was fraudulently underreporting its share of the premium it collected in the
23 State of California. As a result, policyholders, including Plaintiffs and the Class
24 suffered direct injury by reason of Defendants fraud.

25

*Subsequent Injuries Benefits Trust ("SIBT") Fund*

26      73.    The SIBT Fund was created in 2003 to pay benefits to injured workers
27 who have suffered serious injury at work but who also suffer from serious,
28 previously-existing physical impairments or other permanent disabilities. Cal.

-22-

1   Labor Code § 62.5(c)(1). All WC policies issued in California and incepting on or
2   after January 1, 2004, include a surcharge for this Fund. Once the amount necessary
3   to cover claims is determined, the DIR approves an aggregate amount of assessment
4   and allocates it between self-insured employers and insured employers in
5   proportion to payroll respectively paid in the most recent year for which payroll
6   information is available. Cal. Labor Code § 62.6. The assessment is then paid by
7   self-insurers based on a percentage of indemnity paid during the most recent year
8   for which information is available and by insured employers, including Plaintiffs
9   and the Class, as a percentage of premium in the same manner as alleged above
10  with respect to the other surcharges. This surcharge appears on policyholders' bills
11  as "Subsequent Injuries Benefits Trust Fund Assessment." The same charge is
12  sometimes described by other names.

13      74.    California imposed the SIBT surcharge on policyholders who
14  purchased WC policies in this State during years when AIG was fraudulently
15  underreporting its share of the premium it collected in the State of California, with
16  the effect of inflating the amount of the SIBT surcharge that each policyholder paid
17  since 2004. As a result, policyholders, including Plaintiffs and the Class suffered
18  direct injury by reason of Defendants fraud.

19      *Uninsured Employers Benefits Trust ("UEBT") Fund*

20      75.    The UEBT Fund was created in 2003 to pay benefits to workers
21  injured while employed by illegally uninsured employers. All WC policies issued in
22  California and incepting on or after January 1, 2004, include a surcharge for this
23  Fund. Once the amount necessary to cover all non-administrative expenses of this
24  program is determined, the DIR approves an aggregate amount of assessment and
25  allocates it between self-insured employers and insured employers in proportion to
26  payroll respectively paid in the most recent year for which payroll information is
27  available. Cal. Labor Code § 62.6. The assessment is then paid by self-insurers
28  based on a percentage of indemnity paid during the most recent year for which

-23-

1   information is available and by insured employers, including Plaintiffs and the
2   Class, as a percentage of premium in the same manner as alleged above with
3   respect to the other surcharges. This surcharge appears on policyholders' bills as
4   "Uninsured Employers Benefits Trust Fund Assessment." The same charge is
5   sometimes described by other names.

6       76.    California imposed the UEBT surcharge on policyholders who
7   purchased WC policies in this State during years when AIG was fraudulently
8   underreporting its share of the premium it collected in the State of California, with
9   the effect of inflating the amount of the UEBT surcharge that each policyholder
10  paid since 2004. As a result, policyholders, including Plaintiffs and the Class
11  suffered direct injury by reason of Defendants fraud.

12  **Defendants Knew That Their Conduct Was Illegal**

13      77.    Defendants were well aware that their conduct was illegal. Indeed,
14  when executives and even AIG's General Counsel learned of the conduct and
15  challenged it, Defendants repeatedly determined to conceal the illegal conduct and
16  continue to engage in the illegal conduct.

17      78.    According to the New York Attorney General, in June 1989, a
18  compliance and underwriting administration officer for the Risk Management
19  Division of AIG met with the head of AIG-RMI and recommended that certain of
20  AIG's false reporting programs immediately be stopped. His superior responded
21  that none of his presentation was news to him. Indeed, he had made a similar
22  presentation (using stronger language) to his superiors some time earlier, but AIG
23  had decided to continue the illicit practices until it could work out, and
24  implement, an alternative scheme to avoid some substantial part of the taxes and
25  assigned risk assessments on its WC business.

26      79.    In 1991 and 1992, when the fraudulent schemes had been in place for
27  some two decades, E. Michael Joye, who was then General Counsel of AIG,
28  conducted an internal investigation, which concluded with a formal, written report

1   (the "Joye Memorandum") that acknowledged and detailed the company's
2   unlawful conduct.

3       80.    As detailed in the Joye Memorandum, Defendants' conduct in
4   connection with the WC market involved "major elements of illegality", which
5   included: (1) false reporting of WC premium as general liability premium, so as to
6   avoid premium taxes, residual market obligations, and other WC related
7   assessments and expenses, (2) booking fictitious premium and assets, (3)
8   overcharging clients, (4) exceeding maximum legal WC premium, (5) violating
9   SEC regulations, (6) giving illegal rebates to clients, and (7) using unfiled,
10  unapproved WC contracts that would not qualify for regulatory approval in most
11  states.

12      81.    The Joye Memorandum concluded that:

13              A jury could find that the above conduct constitutes
14              various kinds of State and Federal civil and criminal
15              violations, including common law fraud, mail fraud,
16              Securities Act violations, RICO violations, State statutory
17              and regulatory violations, State tax fraud and breach of
18              contract. In addition, this conduct would be a violation of
19              the proposed new Federal insurance fraud statute if it
20              becomes law in early 1992 as expected. The RICO
21              statute, in addition to stringent criminal penalties,
22              provides a treble damages civil action to private plaintiffs.
23              *Potential plaintiffs who could take advantage of this and*
24              *other causes of action are the other insurance companies*
25              *who have to pick up AIG's share of residual market*
26              *assessments and other assessments, the States who lose*
27              *premium tax payments to which they are legally entitled*
28              *and AIG's insureds who pay for residual market*

-25-

1    *assessments and premium taxes that AIG does not report*

2    *or pay.* Also possible are class actions by such plaintiffs

3    seeking bad faith and punitive damages. If successful,

4    such class actions would result in astronomical damages

5    awards against AIG.

6    82.    Specifically, the misconduct identified in the Joye Memorandum, and

7    later admitted by AIG, includes the following:

8        (a)    Defendants falsely reported a substantial portion of their WC

9               premium as general liability premium, in violation of laws that

10              require insurers to accurately report the premium they collect by

11              line of business.

12       (b)    AIG created and implemented an "18-Month Close-Out

13              Program," pursuant to which WC premium collected more than

14              18 months after policy inception was booked as general liability

15              premium. Under the "18-Month Close-Out Program," the AIG

16              Companies purported to terminate WC policies at the first

17              adjustment point, which occurred 18 months after policy

18              inception. Defendants then calculated the refund of WC

19              premium that would be due to the insured if the policy had in

20              fact been terminated and recorded that amount in their books as

21              having been paid to the insured, when in fact no cash was paid.

22              At the same time, Defendants recorded on company books an

23              amount equal to the WC refund as paid to Defendants for a

24              "Stop-Gap Liability Policy," which was then reported as general

25              liability premium. Further premium generated by the WC

26              policies, which the books showed as having been terminated at

27              the 18-month point, also was reported as general liability

28              premium.

1          (c)     AIG instituted a practice of taking down \$25 million each quarter of the expected WC retrospective premium and recording it as premium income on an accrual basis. Defendants booked this premium as reinsurance assumed premium instead of WC premium, in violation of state statutes and regulations which require that premium be reported by line of business. This method allowed Defendants to further avoid payment of state premium taxes, residual market assessments, and other fees and assessments that apply to written direct WC premium but do not apply to reinsurance premium.

(d)     The reporting of fictitious premium and assets on Form 10-K and 10-Q filings that AIG made to the U.S. Securities and Exchange Commission constituted false reports to the SEC, in violation of federal law.

83.    In the course of the internal Joye investigation, if not before, AIG and Greenberg learned that their conduct with respect to booking and reporting WC premium "involve[d] various intentional violations of State and Federal law" and that their WC business was "permeated with illegality." Interviews conducted during AIG's internal investigation revealed further admissions that Defendants engaged in widespread and long running false premium reporting practices, with full knowledge and direction of management, including Greenberg and Other Senior Managers. According to the New York Attorney General, one employee stated that AIG Chairman Greenberg "knows the whole program" and "wants it this way." Another employee stated: "You should be aware that [Greenberg] knows about this and has approved it." And a third employee stated that the false reporting schemes had been reported to AIG's senior management and that Greenberg did not want to change things to "make it legal – he wants to continue as is."

84.    Greenberg and others, including Other Senior Managers, knew and

-27-

1   approved of the false reporting schemes and failed to take corrective action in the
2   form of payment of additional taxes and assessments, despite Joye's discovery and
3   unequivocal identification of their illegality and the need for corrective action. AIG
4   and Greenberg were advised that the false reporting practices were illegal and
5   should be halted, that corrective action needed to be taken, and that restitution had
6   to be made to victims. Defendants ignored this advice, continued the false
7   reporting of premiums, continued to falsify sworn financials, and continued to
8   intentionally benefit from the financial gains created by the false reporting.

9   **Defendants Concealed Their Wrongdoing**

10  85.    For approximately 20 years following issuance of the Joye
11  Memorandum, Defendants took steps to hide their wrongdoing and the true nature
12  and full extent of the harm they caused through their false WC premium reporting
13  practices.

14  86.    Despite dissemination of the Joye Memorandum to AIG executives
15  who had the authority and the responsibility to assure that the AIG Companies
16  followed all applicable laws, Defendants, along with unnamed officers and
17  managing agents who were privy to the internal investigation, failed to end the false
18  WC premium reporting, failed to correct the false certified financial statements,
19  failed to disclose their misconduct and its adverse consequences, and failed to make
20  restitution to all those injured by Defendants' fraudulent misconduct. Instead,
21  Defendants fraudulently concealed the Joye Memorandum and did not follow the
22  advice of its then-General Counsel to immediately stop and remediate the harm
23  caused by their criminally and civilly fraudulent acts.

24  87.    Defendants failed to take proper and lawfully required action to
25  preserve evidence of the false premium reporting misconduct. Instead, Defendants
26  embarked on a cover-up that included the destruction of relevant records, as set
27  forth in greater detail below.

28  88.    AIG and Greenberg disregarded Joye's recommendation that specific

-28-

1   "corrective actions" be taken. In particular, they rejected Joye's express direction
2   that leadership, including Greenberg and the Other Senior Managers, should
3   immediately end the illegal conduct, discharge the employees involved, pay
4   restitution to victims, and adopt appropriate compliance measures. AIG repeatedly
5   was advised by several of its executives that the misreporting of WC premium as
6   reinsurance-assumed premium was fraudulent and in need of correction. Reports
7   addressing the fraudulent nature of AIG Companies' premium reporting and
8   business practices were ignored, not retained, concealed, or destroyed by AIG,
9   Greenberg and those acting at their direction, for the purpose and with the effect of
10   concealing the fraud.

11       89.   Despite repeated internal objections to and notice of the ongoing
12   illegality, Defendants failed to preserve records and other evidence of the
13   misconduct and/or actively and affirmatively destroyed records and other evidence
14   of the misdeeds, in violation of their document retention policies and in violation of
15   their legal and ethical duty to preserve such records and other evidence, including,
16   but not limited to their duty to preserve such records and evidence once they were
17   on notice of the threat of potential litigation. By allowing relevant information
18   concerning the false reporting practices to be destroyed or lost, Defendants, as well
19   as their responsible company officers and employees, acted contrary to legal and
20   corporate requirements pertaining to the preservation of information and evidence.

21       90.   Furthermore, despite the clear and intentional injury caused by the
22   admitted false reporting conduct, neither AIG nor Greenberg took any disciplinary
23   action against any of the responsible individuals who had been identified.

24       91.   After Tizzio advised Joye that AIG and Greenberg were not going to
25   follow his recommendations, Joye resigned as AIG's General Counsel. In his letter
26   of resignation, which his predecessor Waylon Mead later told him would be
27   destroyed by AIG, Joye stated that he could not remain as AIG's top legal officer
28   since AIG refused to implement the corrective actions that he had recommended.

-29-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**AIG's Misconduct Comes to Light**

92.     The Joye Memorandum did not come to light until approximately 2005 or 2006. Until that time, Defendants' underreporting scheme and all of the facts about AIG's conduct and the directives from Greenberg and the Other Senior Managers were known only to Defendants. In 2005 and 2006, federal and New York state authorities launched investigations into the accounting, financial reporting, and insurance brokerage practices of AIG, during which investigations the Joye Memorandum was first uncovered as part of the New York Attorney General's efforts.

93.     Ultimately, AIG and various enforcement authorities reached settlements in 2006. As part of the settlements, AIG admitted its false premium reporting and professed to adopt appropriate financial reporting, corporate governance, and ethical and lawful codes of conduct. Some of the Other Senior Managers who had directed the misconduct resigned. AIG also made payments or placed into escrow a total of $1.64 billion to resolve the above-described investigations. Two hundred and twenty-five million dollars of this money represented payment of fines and penalties, while $330 million of the funds were escrowed for settlement of claims resulting from the underpayment by AIG of its residual market assessments.

94.     In 2007, the National Council on Compensation Insurance, Inc. ("NCCI"), on behalf of the participating companies in the National Workers' Compensation Reinsurance Pool ("NWCRP"), filed suit against Defendants in the U.S. District Court for the Northern District of Illinois, alleging that they were injured to the extent that Defendants' underreporting caused these non-AIG insurers to incur a disproportionate share of the losses and assessments associated with the assigned-risk pool in states that participated in the NWCRP. (California is not a member of the NWCRP.) In 2009, the Court dismissed that lawsuit for lack of standing, and individual insurer members of the NWCRP thereafter brought a class

1 action lawsuit seeking to recover losses suffered by the non-AIG members of the
2 NWCRP, which the plaintiff insurers estimated to be "hundreds of millions of
3 dollars in direct damage … as well as the loss of the use of funds and other
4 consequential damages in excess of \$1 billion." *Safeco Ins. Co. v. American Int'l*
5 *Group, Inc.,* 09CV02026 (N.D. Ill.). In December 2011, the court in *Safeco* granted
6 final approval of a \$450 million settlement, over objections by intervenor and
7 counterclaimant Liberty Mutual, which argued that the settlement was inadequate in
8 part because it required release of all claims without awarding anything for the
9 damages caused by AIG's underreporting of state-levied Fund assessments or
10 residual market assessments in states that have independent residual market
11 mechanisms outside the NWCRP. In March 2013, AIG reached a settlement with
12 Liberty Mutual to resolve its objection and appeal.

13 **Plaintiffs Did Not Know, and Could Not Have Known, of Defendants' Fraud**

14 95. As set forth above, Defendants' fraudulent misconduct involved
15 numerous sophisticated schemes, spanned approximately four decades, and
16 involved misreporting to state insurance departments throughout the country, as
17 well as to shareholders, policyholders, and the SEC. Neither Plaintiffs nor the Class
18 members knew, nor reasonably could be expected to have known, of Defendants'
19 fraud nor of the fact that this fraud impacted them, for a number of reasons.

20 96. First, Plaintiffs and the Class did not have information leading them to
21 believe that Defendants' scheme existed or harmed them. For a period of decades,
22 the only people who knew of Defendants' scheme were Defendants and their
23 conspirators. Defendants affirmatively acted to hide their unlawful conduct from
24 Plaintiffs and the Class. Defendants' false reporting began in approximately 1970
25 and Defendants knew of the illegality of these practices from inception. But rather
26 than disclosing the truth about these practices and about their impact on Plaintiffs
27 and the Class, Defendants continue to this day to take steps to hide their misconduct
28 and the harm it has caused, through fraudulent concealment, destruction of relevant

-31-

1  records, and/or failure to disclose facts relating to their misconduct.

2  97.    To the extent that information about Defendants' scheme was
3  uncovered during the course of state and/or federal investigations, none of these
4  investigations nor the publicly-available information emanating from same, and
5  none of the resulting settlement terms or provisions, alerted nor reasonably could
6  have alerted Plaintiffs or Class Members to the fact that they were damaged in the
7  form of wrongfully inflated surcharges based on Defendants' underreporting.

8  98.    While the Joye Memorandum details a list of potential complainants, it
9  notably does not raise the possibility that Plaintiffs and the Class paid inflated
10 Special Purpose Fund surcharges in California in connection with their workers'
11 compensation insurance covering their California employees. On the contrary, it
12 asserts that through a "residual market loading," or "RML," AIG overcharged its
13 clients for residual market assessments that it never paid, and that it overcharged its
14 clients for state premium taxes it never paid. But it does not say that AIG's insureds
15 paid anything extra for Special Purpose Fund assessments and it says nothing about
16 the effects that AIG's scheme had on the insureds of Other Insurers. With respect to
17 "Guaranty Funds and Special Purpose Funds," the Joye Memorandum reports that
18 AIG's false reporting of WC premium allowed it to pay "substantially lower
19 assessments," and that the amount it avoided paying was "paid as additional
20 assessments by the other insurance companies subject to Guaranty Fund and
21 Special Purpose Fund assessments." But nowhere is it explained that these
22 assessments were passed through to policyholders, and, indeed, in many states they
23 are not. Therefore, even if Class members had access to the New York Attorney
24 General's 2005 Complaint and/or the Joye Memorandum that was made public as a
25 part of that action, these documents did not apprise Plaintiffs nor the Class of the
26 fact that they were injured by AIG's misconduct, nor could they reasonably have
27 afforded Plaintiffs nor the Class notice of same. Nor was there any money set aside
28 in the settlement of that action to indemnify policyholders for these losses, nor have

-32-

1 either of the Plaintiffs nor any Class members received any compensation from any
2 settlement to date to remedy their losses incurred as a result of the inflated SPF
3 surcharges levied against them in California as a result of Defendants' WC
4 premium underreporting.

5    99.   To the extent that Other Insurers learned of Defendants' illegal
6 practices in connection with these investigations, none of these entities disclosed to
7 Plaintiffs what they knew about the misconduct and its effects on Plaintiffs and the
8 Class. Certain Other Insurers took action against AIG in the form of the *Safeco*
9 litigation described above. However, nowhere in any of the court filings from that
10 case is there information that is or was reasonably accessible to Plaintiffs and the
11 Class that would have led Plaintiffs or the Class to believe that they were injured by
12 Defendants' conduct. In fact, the claims asserted by Other Insurers seeking their
13 own damages further disguise the harm to policyholders and mislead the general
14 public from understanding that in California, the policyholders paid the unlawfully
15 inflated Special Purpose Fund surcharges. Plaintiffs were not members of any class
16 represented in the *Safeco* litigation and did not receive any court-mandated notice
17 of that proposed settlement. Moreover, the *Safeco* litigation involved other insurers
18 in assigned-risk-pool states, which California is not.  Thus, no California class
19 member learned nor could have learned from the *Safeco* litigation of any injury that
20 it may have suffered as a result of Defendants' fraudulent underreporting scheme.

21   100.  Second, Plaintiffs and the other class members did not have the
22 necessary expertise in the intricacies of WC regulatory requirements and filings,
23 and the complex manner in which state assessments are calculated, to discover their
24 injury. Defendants and Other Insurers had vastly superior knowledge of the various
25 states' insurance laws, and plaintiffs and the other class members reasonably relied
26 on the peculiar expertise and knowledge of the WC insurance industry, and of state
27 insurance regulators, with respect to such matters. Defendants had contractual and
28 fiduciary obligations to their policyholders to inform them of the unduly high

surcharges if and when they learned about them, and to indemnify Plaintiffs and the Class for these losses, yet Defendants to date have not informed any of their policyholders about the losses sustained by Plaintiffs and the Class.

101. Although they had a duty to disclose the true facts, Defendants have never informed their policyholders, either of the Plaintiffs, nor any other Class members, that AIG's misconduct harmed them in any way. To this day, substantially all class members remain unaware of the injury caused them by Defendants' misconduct.

102. Third, AIG has never provided an accurate accounting of the WC premium it actually collected annually for each year since the 1970s.

103. Based on AIG's admissions and on estimates from actuarial experts and economists during the course of the investigations and lawsuits, the harm to California policyholders, as alleged herein, is on the order of at least tens of millions of dollars over the course of the relevant time period. Indeed, Joye estimated in 1992 that the amount of AIG Companies' workers compensation premium that went unreported nationwide was in the range of $300-400 million or more annually, at then-current levels of business. Yet no money has been allocated for restitution to the insured employers for these losses, nor has the effect of AIG's misconduct on insured employers in the State of California ever been publicly acknowledged.

104. According to sworn filings made in the *Safeco* litigation in late 2011, evidence generated in that litigation revealed that AIG had underreported WC premium during time periods outside those periods as to which AIG has previously admitted the misconduct and in AIG divisions other than those specifically described in the Joye Memorandum. That evidence remains under seal and neither Plaintiffs nor class members have had access to that information.

105. Although the Joye Memorandum became public in 2005 or 2006, and although certain federal and state authorities investigated Defendants' misconduct,

-34-

**CLASS ACTION COMPLAINT**

1  as recently as 2007 AIG's chief underwriting officer raised concerns that AIG
2  might still be continuing to underreport WC premium. According to sworn filings
3  made in the *Safeco* litigation in late 2011, AIG's Deputy General Counsel reported
4  this concern to AIG's outside auditor in 2007, after the conclusion of the New York
5  Attorney General's investigation and after the time period during which AIG had
6  previously admitted underreporting. Evidence relating to this remains under seal
7  and neither Plaintiffs nor class members have had access to that information.

8       106.   Thus, though at all times Plaintiffs and the Class exercised reasonable
9  diligence with respect to the matters herein alleged, none of the Plaintiffs nor other
10 Class members discovered, nor reasonably could have discovered, their injury
11 without consulting with attorneys and other experts who suspected Defendants of
12 their wrongdoing. This did not occur until 2013.

13 **The Conspiracy**

14      107.   At all relevant times, AIG, Greenberg and the Other Senior Managers
15 controlled the AIG Companies. AIG, Greenberg, and the Other Senior Managers
16 caused the AIG Companies to engage in the wrongdoing alleged herein. AIG,
17 Greenberg, and the Other Senior Managers agreed and conspired with each other to
18 carry out the scheme alleged in this complaint and aided and abetted that scheme.

19      108.   At all times material to this Complaint, each Defendant and each Other
20 Senior Manager was the agent, servant, representative, officer, director, partner, or
21 employee of the other Defendants; and, in perpetrating the underreporting scheme
22 as herein alleged, each of them acted in furtherance of the common conspiracy,
23 with the knowledge and consent of AIG and Greenberg, and with the intent and
24 effect as described herein.

25      109.   Defendant AIG Companies all utilized underwriting services of the
26 same underwriter, AIG-RMI, which helped prevent the fraudulent underreporting
27 from being discovered earlier than it was.

28

1

## FACTS PERTAINING TO RICO CLAIMS

2      110.   At all times material to this Complaint, the AIG Companies, the Other
3  Senior Managers, CVSCO and SICO collectively constituted an association-in-fact
4  "enterprise," as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), involving
5  widespread underreporting of WC insurance premium by AIG Companies in
6  California and throughout the United States over an approximate 40-year period.
7  This enterprise had a common purpose, namely, to carry out the underreporting
8  scheme described in this Complaint.

9      111.   At all times material to this Complaint, each AIG Company was an
10  "enterprise" within the meaning of RICO.

11      112.   At all times material to this Complaint, AIG was a "person" within the
12  meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

13      113.   At all times material to this Complaint, Greenberg was a "person"
14  within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

15      114.   At all times material to this Complaint, AIG and Greenberg conducted,
16  and conspired to conduct, the affairs of each of the AIG Companies, CVSCO, and
17  SICO, through a pattern of racketeering activity.

18      115.   AIG, Greenberg, and the Other Senior Managers directed, controlled,
19  and participated in the operation and management of the AIG Companies and each
20  of them, and directed, controlled, and participated in the operation and management
21  of SVCO and SICO.

22      116.   Each of AIG, Greenberg, and the Other Senior Managers had a distinct
23  role and performed a distinct function in perpetrating the fraudulent underreporting
24  schemes, which included directing each of the AIG Companies to undertake
25  numerous acts of mail and/or wire fraud, as described herein; and each received
26  proceeds and/or benefits that were separate and distinct from the proceeds and/or
27  benefits received as a result of each individual act of mail fraud by each of the AIG
28  Companies.

117.   AIG and those persons who conducted its global business operations, including but not limited to Greenberg and the Other Senior Managers, participated in the conduct and operation of the underreporting scheme by the AIG Companies by numerous means, including: devising the nature and mechanics of the false reporting, false booking, and mischaracterizing of WC premium; consciously deciding to direct and directing AIG corporate subsidiary forms (including AIG Companies and others) to undertake fraudulent acts that insulated AIG, Greenberg, and the Other Senior Managers from regulatory enforcement and other liabilities; and directing AIG Companies, their employees, and lower level employees of AIG and other affiliated entities to: (i) disperse the proceeds of the wrongful and unlawful conduct, and (ii) conceal the nature and extent of the lies and wrongdoing. AIG, Greenberg, and the Other Senior Managers directed the AIG Companies in this manner, expecting and intending that Plaintiffs and the Class would be injured by reason of the underreporting fraud. They did so in order to wrongfully enrich themselves over an extended period of time.

118.   Through the association-in-fact enterprise, AIG and Greenberg, acting through AIG officers, employees and agents who exercised influence and control over the business operations of CVSCO and SICO, including Greenberg and the Other Senior Managers, caused CVSCO and SICO to transfer valuable assets owned by those companies to the managers, employees and other agents of the AIG Companies who conceived of or implemented the WC underreporting scheme, and to the managers, employees and other agents of the AIG Companies who had knowledge of the WC underreporting scheme and who therefore were in a position to disclose that scheme to the authorities or the public.  These asset transfers were transacted without any corresponding transfer of consideration to CVSCO and SICO, in order to reward managers, employees and other agents of the AIG Companies for contributing to the AIG profitability, without regard to whether this was achieved by unlawful means, including by racketeering activity. Because the

-37-

1 assets transferred by CVSCO and SICO to managers, employees and other agents
2 of the AIG Companies were extremely valuable, the recipients of these transfers
3 were strongly incentivized to contribute materially to high levels of profitability
4 growth (as reported publicly by AIG) even if (i) unlawful means, such as
5 racketeering activity, were required to make such contributions, and (ii)
6 concealment of the use of such unlawful means were required to continue to make
7 such contributions. Furthermore, because AIG was a publicly owned company, but
8 CVSCO and SICO were not, by rewarding officers, employees and other agents of
9 Defendants for contributing to AIG's publicly reported profitability growth by
10 means of asset transfers from CVSCO and SICO, instead of from AIG directly,
11 AIG was able to avoid the public disclosures that would have been required if these
12 asset transfers had been effected directly by AIG or by the AIG Companies. AIG
13 thereby also avoided the regulatory and public scrutiny that would have
14 accompanied such disclosures had the extent and value of these asset transfers to
15 the officers, employees and other agents of Defendants who conceived of,
16 implemented and/or had knowledge of the AIG WC underreporting scheme, been
17 known to the authorities and to the public.

18     119.    The purpose of the association-in-fact enterprise was thus to corrupt
19 those managers, employees and other agents of the AIG Companies who conceived,
20 implemented, participated in or otherwise had knowledge of the WC underreporting
21 scheme through the undisclosed payment of excessive incentive compensation,
22 thereby enabling the AIG Companies, acting at the direction of AIG and through
23 the individuals who conducted their business operations, to implement those
24 schemes over decades to maximize the reported profitability of AIG and defraud
25 the Plaintiff Class.

26     120.    At all times material to this Complaint, AIG, Greenberg, and the Other
27 Senior Managers, and each of them, operated, managed, and directed the
28 underreporting scheme, including repeatedly and continuously engaging in a pattern

1    of racketeering activity and directing AIG Companies to undertake numerous
2    specific racketeering acts. As part of this common plan, AIG, Greenberg, and each
3    of the Other Senior Managers, individually and collectively, caused each of the
4    AIG Companies to perform all of the following acts, among others:

5          (a)   to send to and file with the CDI false financial statements that
6                underreported the true amount of WC premium written in
7                California by the AIG Companies;

8          (b)   to send to and file with the WCIRB false financial statements
9                that underreported the true amount of WC premium written in
10               California by the AIG Companies;

11         (c)   to send to DIR, CDI, and CIGA monies that purported to satisfy
12               AIG Companies' obligations to DIR, CDI, and CIGA but which
13               underpaid AIG Companies' obligations to DIR, CDI, and CIGA
14               owed for Special Purpose Fund assessments;

15         (d)   to send to their own policyholders billing statements that
16               included false and fraudulent surcharges; and

17         (e)   to make publicly misleading and false statements to conceal
18               their false reporting scheme from the authorities, from their
19               competitors, and from the public, including to shareholders in
20               their annual and other reports, to journalists who reported on
21               AIG, to financial analysts who covered AIG, and to businesses
22               that employed California workers and who purchased WC
23               insurance in California.

24         121.  AIG, Greenberg, and the Other Senior Managers: (1) conducted and
25   participated in the conduct of the affairs of the AIG Companies and each of them
26   through multiple predicate crimes of mail fraud and/or wire fraud in violation of 18
27   U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud); (2) aided and abetted
28   violations by others of these laws, within the meaning of 18 U.S.C. § 2; and (3)

-39-

1   used the mails to deliver and disseminate false responses to financial data calls,
2   false statistical reports, falsely sworn financial statements and other reports,
3   agreements, correspondence, policy materials, premium reports and notices,
4   payments of tax obligations and Special Purpose Fund assessments, reports to
5   insurance regulators, reports to other government agencies, and notices to
6   policyholders and other insurers, for the purpose of an unlawful scheme to obtain
7   money by false misrepresentations, all in violation of the mail fraud statute.

8       122. Materials transmitted by mail and/or by wire that contained knowing
9   and intentional misrepresentations and omissions that were intended to deceive
10   included, among others:

11           (a)   Annual false certifications and reports concerning the true and
12               correct amount of WC premium collected by the AIG
13               Companies in California, as well as in other states across the
14               nation, including in documents mailed to insurance regulators,
15               ratings bureaus and advisory organizations;

16           (b)   Fraudulent and undisclosed agreements used to further the
17               overall fraud and schemes to falsely report, mischaracterize, and
18               understate WC premiums;

19           (c)   Payments of assessments to the State that were inaccurately low;
20               and

21           (d)   Policyholder billing statements containing inaccurate, inflated
22               surcharges that resulted in substantial overcharges to
23               policyholders.

24       123. Defendants' racketeering activity was frequent and continuous,
25   beginning in approximately 1970 and continuing for approximately forty years.
26   Each successive mail and/or wire fraud was related to the overall scheme to defraud
27   Plaintiffs and the Class, among others. Defendants' acts constitute a "pattern of
28   racketeering activity" within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5).

1    124. Plaintiffs and the Class members have been directly injured in their
2    business and their property by reason of Defendants' racketeering activity.

3    125. This pattern of racketeering activity consisted of the following specific
4    acts, among others:

5    126. *Racketeering Act One: mailing of fraudulent annual financial*
6    *statement to California Insurance Commissioner ("CIC"):* On or about March 1,
7    1974, each of the AIG Companies other than American Fuji Fire and Marine
8    Insurance Company, in furtherance of the underreporting scheme, knowingly
9    mailed or caused to be mailed to the CIC an Annual Statement that falsely
10   represented the amount of annual net direct WC premium that the company had
11   collected during the 1973 calendar year. This financial statement was verified under
12   oath by one or more of the respective AIG Companies' executive officers. The
13   mailing of this document violated 18 U.S.C. §§ 1341 and 2, and was an integral
14   part of the scheme that damaged Plaintiffs and the Class as alleged herein.

15   127. *Racketeering Act Two: mailing of fraudulent annual financial*
16   *statement to CIC:* On or about March 1, 1979, each of the AIG Companies other
17   than American Fuji Fire and Marine Insurance Company, in furtherance of the
18   underreporting scheme, knowingly mailed or caused to be mailed to the CIC an
19   Annual Statement that falsely represented the amount of annual net direct WC
20   premium that the company had collected during the 1978 calendar year. This
21   financial statement was verified under oath by one or more of the respective AIG
22   Companies' executive officers. The mailing of this document violated 18 U.S.C.
23   §§ 1341 and 2, and was an integral part of the scheme that damaged Plaintiffs and
24   the Class as alleged herein.

25   128. *Racketeering Act Three: mailing of fraudulent annual financial*
26   *statement to CIC:* On or about March 1, 1984, each of the AIG Companies other
27   than American Fuji Fire and Marine Insurance Company, in furtherance of the
28   underreporting scheme, knowingly mailed or caused to be mailed to the CIC an

-41-

1  Annual Statement that falsely represented the amount of annual net direct WC
2  premium that the company had collected during the 1983 calendar year. This
3  financial statement was verified under oath by one or more of the respective AIG
4  Companies' executive officers. The mailing of this document violated 18 U.S.C.
5  §§ 1341 and 2, and was an integral part of the scheme that damaged Plaintiffs and
6  the Class as alleged herein.

7      129. *Racketeering Act Four: mailing of fraudulent annual financial*
8  *statement to CIC:* On or about March 1, 1989, each of the AIG Companies other
9  than American Fuji Fire and Marine Insurance Company, in furtherance of the
10 underreporting scheme, knowingly mailed or caused to be mailed to the CIC an
11 Annual Statement that falsely represented the amount of annual net direct WC
12 premium that the company had collected during the 1988 calendar year. This
13 financial statement was verified under oath by one or more of the respective AIG
14 Companies' executive officers. The mailing of this document violated 18 U.S.C.
15 §§ 1341 and 2, and was an integral part of the scheme that damaged Plaintiffs and
16 the Class as alleged herein.

17     130. *Racketeering Act Five: mailing of fraudulent annual financial*
18 *statement to CIC:* On or about March 1, 1994, each of the AIG Companies, in
19 furtherance of the underreporting scheme, knowingly mailed or caused to be mailed
20 to the CIC an Annual Statement that falsely represented the amount of annual net
21 direct WC premium that the company had collected during the 1993 calendar year.
22 This financial statement was verified under oath by one or more of the respective
23 AIG Companies' executive officers. The mailing of this document violated 18
24 U.S.C. §§ 1341 and 2, and was an integral part of the scheme that damaged
25 Plaintiffs and the Class as alleged herein.

26     131. *Racketeering Act Six: mailing of fraudulent annual financial statement*
27 *to CIC:* On or about March 1, 1999, each of the AIG Companies, in furtherance of
28 the underreporting scheme, knowingly mailed or caused to be mailed to the CIC an

-42-

1 Annual Statement that falsely represented the amount of annual net direct WC
2 premium that the company had collected during the 1998 calendar year. This
3 financial statement was verified under oath by one or more of the respective AIG
4 Companies' executive officers. The mailing of this document violated 18 U.S.C.
5 §§ 1341 and 2, and was an integral part of the scheme that damaged Plaintiffs and
6 the Class as alleged herein.

7     132. *Racketeering Act Seven: mailing of fraudulent annual financial*
8 *statement to CIC:* On or about March 1, 2004, each of the AIG Companies, in
9 furtherance of the underreporting scheme, knowingly mailed or caused to be mailed
10 to the CIC an Annual Statement that falsely represented the amount of annual net
11 direct WC premium that the company had collected during the 2003 calendar year.
12 This financial statement was verified under oath by one or more of the respective
13 AIG Companies' executive officers. The mailing of this document violated 18
14 U.S.C. §§ 1341 and 2, and was an integral part of the scheme that damaged
15 Plaintiffs and the Class as alleged herein.

16     133. Each of the racketeering acts committed by or at the direction of AIG,
17 Greenberg, and the Other Senior Managers was related, had the same or similar
18 purpose of executing the scheme and unlawful conduct alleged herein, involved the
19 same or similar participants and method of commission, had similar results, and
20 directly impacted similar victims, including Plaintiffs and the Class.

21     134. To effectuate the illegal scheme, AIG, Greenberg, and the Other
22 Senior Managers also used and caused the use of mails in interstate commerce to
23 deliver insurance billing statements to policyholders that contained surcharges that
24 had been calculated on the basis of, and thereby incorporated, AIG's and AIG
25 Companies' false statements regarding WC premium. AIG, Greenberg, and each of
26 the Other Senior Managers also sent and received agreements, communications,
27 and correspondence through the mails and received ill-gotten payments through
28 mail and/or wire. Each such act furthered the scheme and injured Plaintiffs and the

-43-

1  Class as alleged herein.

2  135.  The repeated acts of mail and wire fraud described above constitute a
3  "pattern of racketeering activity" within the meaning of 18 U.S.C. §§1961(1) and
4  1961(5).

5  136.  Defendants' racketeering activities affected interstate commerce. AIG
6  is one of the largest providers of WC insurance in the U.S., offering a nationwide
7  network of underwriting and program design services, claims operations, and loss
8  control services to business of virtually any size in virtually every industry in the
9  national market. The underreporting scheme was a nationwide scheme. At the same
10 time that they were directing the AIG Companies to perpetrate the underreporting
11 scheme in California, they were also directing these and other AIG Companies to
12 perpetrate the same scheme in numerous other states. In addition, many of the class
13 members did business across state lines, so the losses they incurred as a result of the
14 decades of inflated overcharges that they paid in California affected the class
15 members' ability to compete generally by causing them to incur additional costs of
16 doing business that they should not have been required to expend.

17                    **REPRESENTATIVE PLAINTIFFS' FACTUAL ALLEGATIONS**
18 **Plaintiff Franjo, Inc.**

19 137.  Between approximately 1994 and the present, Plaintiff Franjo, Inc. has
20 employed from 12 to 27 employees at its occupational medical clinics in the
21 Fresno, California area.

22 138.  During this timeframe, Franjo has paid for WC insurance coverage in
23 the State of California each and every year. At various times, Franjo has paid for
24 WC insurance coverage from insurers including SCIF; Hartford; Superior National;
25 Farmers; and Travelers.

26 139.  Franjo has typically paid between $10,000 and $12,000 in WC
27 insurance premium per year.

28 140.  In addition, during this timeframe, each time that the State of

-44-

1  California assessed any and all Special Purpose Fund surcharges on California
2  policyholders, Franjo has paid same.

3      141.  In paying the monies described above, Franjo relied on Special
4  Purpose Fund charges shown on the statements it received from its insurers.
5  Franjo's insurers relied on state regulators to set Special Purpose Fund assessments
6  to be billed to Franjo at the instruction of the state regulators; Franjo's insurers also
7  relied on state regulators to accurately determine the assessments made on the
8  insurers, which they then passed through to Franjo.

9      142.  In setting Special Purpose Fund assessments, state regulators relied on
10 Defendants' reporting of WC insurance premium written in the State of California.

11     143.  Because Defendants underreported WC insurance premium written in
12 the State as described in this Complaint, Franjo paid improperly inflated Special
13 Purpose Fund assessments and was injured thereby.

14     144.  Franjo was injured in its business or property as a direct result of
15 Defendants' scheme.

16     145.  At no time before approximately January 2013, when Franjo was
17 informed of same during the course of investigation by its counsel herein, was
18 Franjo aware of the existence of Defendants' scheme, of Defendants'
19 underreporting of WC insurance premium in the state (or elsewhere) generally, of
20 any impact that Defendants' underreporting of WC insurance premium had or could
21 have on Plaintiffs or the Class, or of its own injury. Defendants' scheme and
22 conduct, and the injuries resulting to Franjo, were and are so arcane that Franjo did
23 not become aware of same until well within three years prior to the filing of this
24 suit. Nor, for the reasons described above, could Franjo reasonably have become
25 aware of same at an earlier time.

26 **Plaintiff DMS Facility Services, Inc.**

27     146.  Between approximately 1967 and the present, Plaintiff DMS Facility
28 Services, Inc. has employed from 800 to 3000 California employees in the building

-45-

1     services business throughout the State of California.

2          147. During this timeframe, DMS has paid for WC insurance coverage in
3 the State of California each and every year. At various times, DMS has paid for WC
4 insurance coverage from insurers including, among others, Fremont American,
5 National American Insurance Company of California, Cal. Comp., Cal. Indemnity,
6 Falcon Insurance Company, C E Heath Insurance Company, HIH Insurance
7 Company, SCIF, CNA, and Zurich.

8          148. During this timeframe, each time that the State of California assessed
9 any and all Special Purpose Fund surcharges on California policyholders, DMS has
10 paid same.

11          149. In paying the monies described above, DMS relied on Special Purpose
12 Fund charges shown on the statements it received from its insurers. DMS's insurers
13 relied on state regulators to set Special Purpose Fund assessments to be billed to
14 DMS at the instruction of the state regulators; DMS's insurers also relied on state
15 regulators to accurately determine the assessments made on the insurers, for which
16 they then billed DMS.

17          150. In setting Special Purpose Fund assessments, state regulators relied on
18 Defendants' reporting of WC insurance premium written in the State.

19          151. Because Defendants underreported WC insurance premium written in
20 the State as described in this Complaint, DMS paid improperly inflated Special
21 Purpose Fund assessments and was injured thereby.

22          152. DMS was injured in its business or property as a direct result of
23 Defendants' scheme.

24          153. At no time before approximately February 2013, when DMS was
25 informed of same during the course of investigation by its counsel herein, was
26 DMS aware of the existence of Defendants' scheme, of Defendants' underreporting
27 of WC insurance premium in the state (or elsewhere) generally, of any impact that
28 Defendants' underreporting of WC insurance premium had or could have on

1  Plaintiffs or any of the Class members, or of its own injury. Defendants' scheme
2  and conduct, and the injuries resulting to DMS, were and are so arcane that DMS
3  did not become aware of same until well within three years prior to the filing of this
4  suit. Nor, for the reasons described above, could DMS reasonably have become
5  aware of same at an earlier time.

6  154. Defendants' misconduct caused Plaintiffs and the Class to incur tens of
7  millions of dollars in out-of-pocket losses, as well as millions more arising from the
8  loss of use of these funds and other consequential damages. This Complaint seeks
9  to redress the injury to Plaintiffs and to the other members of the Class incurred as a
10 result of Defendants' underreporting in California.

11                              **CLASS ACTION ALLEGATIONS**

12 155. Plaintiffs bring this action individually and on behalf of a class of
13 similarly situated employers. The Class is initially defined as follows:

14                    All persons and/or entities who purchased WC insurance
15                    covering employees in the State of California since 1970.

16 156. If necessary, Plaintiffs will move to certify sub-classes for (a) persons
17 who purchased WC insurance covering employees in the State of California from
18 any Other Insurer (including the SCIF), and (b) persons who purchased WC
19 insurance covering employees in the State of California from any AIG Company.

20 157. Excluded from the above class(es) are Defendants, any entities in
21 which Defendants have a controlling interest, and officers or directors of
22 Defendants. Plaintiffs reserve the right to modify the class definitions and the class
23 period based on the results of discovery and/or rulings of the Court.

24 158. Because the misconduct occurred over a period of time that lasted
25 many decades, Plaintiffs and other Class members purchased WC insurance
26 policies from various insurers during the relevant time period. Nonetheless, because
27 employers doing business in California all were affected the same way—in the
28 form of inflated uniform percentages charged to them on the applicable policy

-47-

1   billing statements for Special Purpose Fund surcharges—the Class consists of all
2   policyholders, including those insured by AIG Companies. This action is brought as
3   a class action and may properly be so maintained pursuant to the provisions of the
4   Federal Rules of Civil Procedure 23(a) and 23(b).

5       159. *Numerosity of Class* - The class consists of all policyholders who
6   purchased WC insurance covering employees in the State of California since 1970,
7   and thus is so numerous that joinder of all class members would be impracticable.
8   Plaintiffs are informed and believe that there are thousands of members of the class.
9   The number and identities of class members can be ascertained through business
10  records regularly maintained by the State, the WCIRB and other insurance-related
11  advisory organizations, Defendants and their employees and agents, Other Insurers
12  and their agents, and through the media. Members of the Class(es) can be notified
13  of the pending action by e-mail, mail, and supplemented by published notice, if
14  necessary.

15      160. *Existence and Predominance of Common Questions of Fact and Law* -
16  There are questions of law and fact common to the Class. These questions
17  predominate over any questions affecting only individual class members. These
18  common legal and factual issues include, but are not limited to:

19          (a)    Whether Defendants had a duty to file accurate annual financial
20                 or other statements with the CDI with respect to the volume of
21                 WC premium they collected annually
22          (b)    Whether Defendants underreported to California regulators the
23                 volume of WC premium that they collected from California
24                 policyholders
25          (c)    Whether Defendants' underreporting caused higher surcharges
26                 to be assessed on California policyholders
27          (d)    Whether Defendants' underreporting constitutes an unlawful,
28                 unfair, or fraudulent business practice that damaged Plaintiffs

-48-

1        and the Class

2   (e)  Whether Defendant defrauded and conspired to defraud, among

3        others, their own policyholders and the policyholders of Other

4        Insurers by using the mail and wires to send (i) false and falsely

5        sworn financial statements that underreported the true amount of

6        WC written in California by the AIG Companies and other

7        unnamed AIG affiliates; (ii) invoices to their policyholders that

8        included knowingly improper SPF charges; (iii) underpayments

9        to the State of California of Defendants' obligations for SPF

10       assessments, which falsely purported to satisfy a debt owed to

11       the State of California while at the same time underfunding the

12       State's SPFs and thereby causing Plaintiffs and the Class to

13       overpay the surcharges levied against policyholders to fund

14       these Funds; (iv) false and misleading annual reports and other

15       reports to shareholders, and to various state and federal

16       agencies, which contained misrepresentations about the amount

17       of WC premium collected, SPF assessments and premium taxes

18       owed; etc.

19   (f)  Whether Defendants obtained and conspired to obtain, through

20       their underreporting of their true proportionate share of the

21       California WC market annually since approximately 1970,

22       substantial economic benefit from their avoidance of state

23       premium taxes and from their underpayment of SPF assessments

24       collected from policyholders

25   (g)  Whether AIG violated 18 U.S.C. § 1962(c) and (d)

26   (h)  Whether Defendants affirmatively misrepresented the true value

27       of the premium they collected to the general public, including

28       Plaintiffs and the Class

-49-

1     (i)   Whether Defendants successfully concealed from the public,
2           including Plaintiffs and the Class, the harm that their fraudulent
3           scheme caused to policyholders, including Plaintiffs and the
4           Class

5     (j)   Whether Defendants engaged in the alleged misconduct and/or
6           successfully concealed from the public, including Plaintiffs and
7           the Class, the harm that their unfair, unlawful, and
8           anticompetitive underreporting of WC premium caused to
9           policyholders

10    161.  *Typicality* - The claims of the representative Plaintiffs are typical of
11    the claims of the members of the Class. The representative Plaintiffs and the
12    members of the Class were and are similarly or identically harmed by the same
13    unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct
14    engaged in by Defendants. The representative Plaintiffs' individual damages, like
15    the damages of all class members, were improperly inflated surcharges.

16    162.  *Adequacy* - The representative Plaintiffs will fairly and adequately
17    represent and protect the interests of the Class and have retained counsel who are
18    experienced and competent trial lawyers in complex and class action litigation.
19    There are no material conflicts between the claims of the representative Plaintiffs
20    and the Class Members that would make class certification inappropriate. Counsel
21    for the Class will vigorously assert the claims of all Class Members.

22    163.  *Predominance and Superiority* - This suit may be maintained as a class
23    action under Federal Rule of Civil Procedure 23(b)(3) because questions of law and
24    fact common to the Class predominate over the questions affecting only individual
25    members of the Class and a class action is superior to other available means for the
26    fair and efficient adjudication of this dispute. The damages suffered by individual
27    class members, while substantial, are small compared to the burden and expense of
28    individual prosecution of the complex and very expensive litigation needed to

1   address Defendants' conduct. Even if class members themselves could afford such
2   individual litigation, the court system would be overwhelmed by the individual
3   lawsuits. In addition, individualized litigation would increase the delay and expense
4   to all parties and to the court system resulting from the complex legal and factual
5   issues of this case. Individualized litigation also presents a potential for inconsistent
6   or contradictory judgments. By contrast, the class action device presents far fewer
7   management difficulties; allows the hearing of claims which might otherwise go
8   unaddressed because of the relative expense of bringing individual lawsuits; and
9   provides the benefits of single adjudication, economies of scale, and comprehensive
10  supervision by a single court.

11      164. Plaintiffs anticipate no significant or unusual difficulty in the
12  management of this action because:

13          (a)     Defendants' racketeering activities, unfair business practices,
14                  and fraud all consisted of the same acts and concealments,
15                  without material variation, perpetuated in the same manner on
16                  all class members, all of whom relied in the same manner on
17                  Defendants' misrepresentations to state insurance regulators,
18                  rating bureaus, and the general public, as evidenced by their
19                  payments of the unlawfully inflated surcharges, which they
20                  believed to be lawful and mandatory charges.

21          (b)     Defendants have admitted to substantially all of the conduct
22                  giving rise to these claims.

23          (c)     Evidence proving the relevant facts that Defendants have not
24                  admitted to is ascertainable through public records and/or
25                  discovery.

26          (d)     The identities of the class members are known or readily
27                  ascertainable.

28      165. The named Plaintiffs contemplate the eventual issuance of notice to

-51-

1   the proposed Class members setting forth the subject and nature of the instant
2   action. Upon information and belief, Defendants' own business records, the
3   business records of Other Insurers, state records, and electronic media can be
4   utilized for the contemplated notices. To the extent that any further notices may be
5   required, the named Plaintiffs contemplate the use of additional media and/or
6   mailings.

7                              **CLAIMS FOR RELIEF**
8                            **FIRST CLAIM FOR RELIEF**
9                    **RICO – Violation of 18 U.S.C. § 1962(c)**
10                   **Against Defendants AIG and Greenberg**

11       166.  Plaintiffs repeat and re-allege each and every allegation set forth above
12   in paragraphs 1 through 165 above as if fully set forth herein.

13       167.  AIG and Greenberg violated, and caused the AIG Companies and
14   other members of the association-in-fact enterprise to violate 18 U.S.C. § 1341
15   (mail fraud) and/or 18 U.S.C. § 1343 (wire fraud) well over 100 separate and
16   distinct times over an approximately 40-year time period.

17       168.  In performing the acts herein alleged, AIG and Greenberg violated 18
18   U.S.C. §1962(c) by conducting or participating in, directly or indirectly, the
19   conduct of the affairs of the AIG Companies and the other members of the
20   association-in-fact enterprise, and each of them, through a pattern of racketeering
21   activity.

22       169.  In doing the acts herein alleged, AIG and Greenberg engaged in a
23   pattern of racketeering activity as defined at 18 U.S.C. § 1961(5), by committing at
24   least two acts of racketeering after 1970, the last of which occurred within ten years
25   of a prior act of racketeering activity.

26       170.  AIG's and Greenberg's racketeering affected interstate commerce.

27       171.  Plaintiffs and the Class were directly injured in their business or
28   property by reason of AIG's and Greenberg's racketeering activities.

-52-

1
2
3

**SECOND CLAIM FOR RELIEF**

**RICO – Violation of 18 U.S.C. § 1962(d)**

**Against Defendants AIG and Greenberg**

4   172. Plaintiffs repeat and re-allege each and every allegation set forth in
5   paragraphs 1 through 165 above as if fully set forth herein.

6   173. AIG and Greenberg agreed and conspired with each other to violate 18
7   U.S.C. §1962(c).

8   174. AIG and Greenberg agreed that at least two of the predicate acts of
9   mail fraud and/or wire fraud would be committed in furtherance of the
10  underreporting scheme.

11  175. The object of the racketeering conspiracy was for AIG and Greenberg
12  to obtain substantial economic benefit in the form of money improperly retained by
13  AIG and the AIG Companies. Defendants gained this benefit by avoiding certain
14  premium tax liabilities, by wrongfully causing the assessment liabilities to be
15  assumed or paid by Plaintiffs and the Class, and by failing to remit to the State the
16  full amount of monies collected from their policyholders in the form of SPF
17  surcharges.

18  176. It was further the object of the conspiracy that AIG and Greenberg
19  concealed and directed others to conceal from Plaintiffs and the Class, and others,
20  the acts undertaken in furtherance of the conspiracy.

21  177. It was further the object of the conspiracy to generate profits,
22  compensation, bonuses, and benefits for AIG and Greenberg that they would not
23  otherwise have received.

24  178. The foregoing conduct constitutes a conspiracy to violate 18 U.S.C.
25  § 1962(c), in violation of 18 U.S.C. § 1962(d).

26  179. Plaintiffs and the Class were directly injured in their business and
27  property by reason of the foregoing conspiracy.

28

-53-

1

**THIRD CLAIM FOR RELIEF**

2

**Common Law Fraud – Cal. Civil Code §§ 1709, 1710, 1711,**

3

**1572**

4

**Against All Defendants**

5       180.  Plaintiffs repeat and re-allege each and every allegation set forth in

6    paragraphs 1 through 165 above as if fully set forth herein.

7       181.  Beginning in approximately 1970, Defendants carried out schemes to

8    mischaracterize, falsely report, and falsely book the AIG Companies' WC premium

9    as other premium. Specifically, Defendants knowingly and repeatedly, year after

10   year, submitted false statistical reports and false annual statements to the State of

11   California and, by virtue of the fact that these financial statements were public

12   filings, to the general public, including Plaintiffs and the Class. In these publicly

13   available financial statements, Defendants falsely represented their volume of

14   business in California by underreporting the amount of WC premium they collected

15   from businesses with California employees.

16      182.  The false statements regarding the amount of WC insurance premium

17   that AIG Companies collected in California were material, in that DIR, CDI, and

18   CIGA calculated the amount of annual Special Purpose Fund assessments to be

19   charged to policyholders based on the reported amount of WC insurance premium.

20   The underreporting of premium by Defendants reduced the total premium reported

21   by all insurers, making it appear to DIR, CDI, and CIGA that these agencies needed

22   to charge higher assessments as a percentage of premium in order to collect the

23   amount of money necessary to operate the Special Purpose Fund programs. These

24   agencies did, in fact, rely on Defendants' false statements in making their

25   calculations, and policyholders were overcharged over an approximate 40-year-

26   period as a result.

27      183.  AIG Companies furthered this fraud when they repeated in their

28   invoices to their policyholders the falsely inflated assessment rate levied by the

-54-

1  relevant California agencies. Although Defendants truthfully presented what the
2  State was charging for the Special Purpose Fund assessments in a given year,
3  Defendants knew that in reality, these were overcharges, because if they had
4  correctly reported the volume of WC premium they had collected, the assessment
5  rate would have been lower.

6  184. When Defendants made these misrepresentations to state agencies,
7  Defendants knew them to be false. And when Defendants informed their
8  policyholders that each of the policyholders owed a particular percentage of its
9  premium to fund the State's Special Purpose Fund programs, Defendants knew that
10  this information also was false.

11  185. Defendants made these false and misleading statements with the intent
12  to defraud and deceive Plaintiffs and the Class, the general public, the State of
13  California, and other insurers, including SCIF. Furthermore, Defendants made these
14  misrepresentations with the intent to induce Plaintiffs and the Class to rely on the
15  material misstatements and to pay the overcharges to the State, to the detriment of
16  Plaintiffs and the Class.

17  186. State regulators justifiably relied on Defendants' underreporting as
18  described herein, including in their calculation of assessments to be made on
19  insurers who wrote workers' compensation policies for businesses with California
20  employees and in their calculations of the SPF assessments to be surcharged to
21  those policyholders.

22  187. Other Insurers in the state justifiably relied on Defendants'
23  underreporting as described herein and justifiably relied on the assessments made
24  on them by state regulators and on the regulators' instructions to collect a certain
25  amount in surcharges from policyholders for purposes of financing the
26  operating/administrative costs of the state's SPFs.

27  188. At all times herein relevant, Plaintiffs and the other Class members
28  were ignorant of the falsity of Defendants' representations and believed them to be

1   true and acted in reliance on this belief, to their detriment.

2       189. Plaintiffs and the other Class members reasonably and justifiably
3   relied on Defendants' false reports and misrepresentations, as communicated to
4   Plaintiffs and the other Class members on their billing statements and in documents
5   that Defendants publicly filed. This reliance was reasonable because Defendants'
6   obligation to accurately report the amount of WC premium that they collected is,
7   and at all relevant times was, statutorily prescribed. Insurers must attest to the truth
8   of these reported numbers under oath, and executives of AIG Companies did so
9   with respect to each annual financial statement filed during the relevant time period.
10  Plaintiffs and the Class had no reason to question the validity of the Special
11  Purpose Fund surcharges on their billing statements.

12      190. Even after information about AIG's fraudulent scheme began to come
13  to light in the course of New York Attorney General investigations into a wide
14  array of alleged misconduct, Plaintiffs and the Class still had no reason to suspect
15  that the underreporting had affected them, due to the wide scale and ongoing cover-
16  up that took place and, indeed, still is taking place, as described in greater detail
17  above. The nature of the fraudulent scheme was so complicated, and the effects on
18  insured policyholders so insidious, that Plaintiffs and the other Class members, as
19  end-of-transaction consumers, could not and did not understand that they had been
20  damaged by virtue of the underreporting scheme.

21      191. Plaintiffs and the Class relied to their detriment on Defendants'
22  intentional misrepresentations about the WC premium that Defendants collected, in
23  that Plaintiffs and the Class paid these inflated surcharges year after year, for
24  decades. If Plaintiffs and the Class had known the true facts, they would not have
25  paid the inflated Special Purpose Fund surcharges. Plaintiffs' reliance on
26  Defendants' misrepresentations was a substantial factor in causing their harm.

27      192. As a direct and proximate result of Defendants' fraud and deceit and
28  Plaintiffs' and the Class members' reliance thereon, Plaintiffs and the other Class

-56-

1    members suffered substantial financial harm in an amount to be proven at trial.

2         193.   The herein-described conduct of Defendants, and each of them, was
3    and is willful, malicious, fraudulent, and outrageous. Furthermore, officers,
4    directors, and managing agents of AIG and each of the AIG Companies participated
5    in, authorized, expressly and impliedly ratified, and had full knowledge of, each of
6    the fraudulent and deceptive acts described herein. Plaintiffs and the Class, for the
7    sake of example and by way of punishing Defendants, therefore seek and are
8    entitled to punitive damages in an amount according to proof.

9                        **FOURTH CLAIM FOR RELIEF**

10                       **Negligent Misrepresentation**

11                          **Against All Defendants**

12        194.   Plaintiffs repeat and re-allege each and every allegation set forth in
13    paragraphs 1 through 165 above as if fully set forth herein.

14        195.   Defendants' underreporting of the amount of WC insurance premium
15    written in the state was a misrepresentation of past or existing material fact.

16        196.   Defendants had no reasonable ground for believing the information
17    they reported to state regulators was true or accurate.

18        197.   Defendants made these misrepresentations with the intent that state
19    regulators would rely thereon in calculating, inter alia, assessments made on
20    insurance companies providing WC insurance in the state and assessments made on
21    policyholders for SPFs.

22        198.   Defendants made these misrepresentations with the intent that Other
23    Insurers would rely thereon in their participation in the residual market for WC
24    insurance and with the intent that Other Insurers would rely on assessments made
25    on them by state regulators, which state regulators instructed them to collect from
26    policyholders for purposes of operating SPFs.

27        199.   State regulators justifiably relied on Defendants' underreporting, as
28    described herein, and justifiably relied on the underreporting in calculating

1    assessments on insurers who wrote workers' compensation policies for employers
2    of California employees and in calculating SPF surcharges to be made on
3    policyholders who bought workers' compensation insurance policies in the state.

4        200. Other Insurers in the state justifiably relied on Defendants'
5    underreporting as described herein and justifiably relied on the assessments made
6    on them by state, which state regulators instructed them to collect from
7    policyholders for purposes of operating SPFs.

8        201. Plaintiffs and the Class justifiable relied on Defendants'
9    underreporting, as described herein, in paying inflated SPF surcharges that
10   appeared on their workers' compensation insurance policy premium invoices.

11       202. Plaintiffs and the class were damaged in the form of paying inflated
12   assessments for SPFs.

**FIFTH CLAIM FOR RELIEF**

**Violation of Cal. Bus. & Prof. Code § 17200 *et seq.* –**

**Unlawful, Unfair or Fraudulent Business Acts and Practices**

**Against All Defendants**

17       203. Plaintiffs repeat and re-allege each and every allegation set forth in
18   paragraphs 1 through 202 above as if fully set forth herein.

19       204. Defendants' acts and practices as described herein constitute unlawful,
20   unfair or fraudulent business acts and practices.

21       205. The Unfair Business Practices Act (California Bus. & Prof. Code §
22   17200) defines unfair competition to include "any unlawful, unfair or fraudulent
23   business act or practice." The Act also provides for injunctive relief, restitution, and
24   disgorgement of profits for violations.

25       206. Defendants' unlawful, unfair, and fraudulent business acts and
26   practices are described throughout this Complaint and include, but are not limited
27   to, falsely reporting the true amount of WC that AIG Companies collected in
28   California each year since approximately 1970. These acts were unlawful in, among

-58-

1    other ways, the fact that the signing and filing of annual financial statements with
2    the CIC that contained willfully false reports or statements regarding the business,
3    affairs, or conditions of an insurer, with intent to deceive any public officer, office,
4    or board to which such insurer is required by law to report, is guilty of a felony
5    pursuant to Cal. Ins. Code § 900.9.101.

6         207. The conduct of Defendants also violated 18 U.S.C. § 1962(c), as
7    described in greater detail above, in that Defendants, and each of them, conducted
8    and continuously engaged in a pattern of racketeering, in violation of federal law.

9         208. The conduct of Defendants, and each of them, also violated the
10   "unfair" prong of Business & Professions Code §17200, in that the acts set forth in
11   this complaint cheated California's workers' compensation insurance policyholders
12   out of tens of millions of dollars of surcharges that should have not been paid, but
13   were paid, by the policyholders solely as a result of Defendants' misreporting of the
14   WC premium they collected.

15        209. The conduct of Defendants, and each of them, was also fraudulent
16   within the meaning of Business & Professions Code §17200, in that California's
17   regulators and policyholders were actually deceived by Defendants' misreporting of
18   the WC premium they collected. As a result of Defendants' intentional fraudulent
19   and deceptive conduct, Plaintiff and all other Class members were deceived into
20   paying more in Special Purpose Fund assessments than they were obligated to pay.

21        210. Plaintiffs and the Class members, and each of them, have been
22   damaged by said practices, suffered injury in fact, and lost money as a result of
23   these unfair business practices. Pursuant to California Business and Professions
24   Code §§ 17200 and 17203, Plaintiffs, individually and on behalf of all others
25   similarly situated, seek restitution of money and property lost as a result of
26   Defendants' unfair, unlawful, and fraudulent business practices.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SIXTH CLAIM FOR RELIEF

## Unjust Enrichment

## Against All Defendants

211.   Plaintiffs repeat and re-allege each and every allegation set forth in paragraphs 1 through 210 above as if fully set forth herein.

212.   Because of the AIG Companies' false WC premium reporting, Defendants enjoyed the benefit of paying less in Special Purpose Fund assessments over the course of an approximate 40-year period, while at the same time collecting from their own policyholders a higher amount in Special Purpose Fund surcharges than they were remitting to the State. This allowed Greenberg, AIG, and the AIG Companies to obtain and keep money and profits that they were not lawfully entitled to keep. The benefits of the wrongdoing were shared by AIG, Greenberg, and the Other Senior Managers in the form of profits, compensation, bonuses, and other benefits that they would not otherwise have received.

213.   By contrast, Plaintiffs and the other Class members paid more in Special Purpose Fund surcharges than they would have if AIG Companies had accurately reported the WC premium they collected from California employers. In this way, Plaintiffs unknowingly conferred an unjust benefit upon Defendants.

214.   In addition, reserves were understated for decades, making additional capital available to AIG to invest that would not have been available but for the false reporting. The availability of this additional capital enabled AIG to realize and report substantial gains due to the investment of this capital.

215.   AIG unjustly retained these substantial benefits that accrued to it from the false reporting.

216.   The retention of these benefits by AIG arising from the false reporting of WC premium violates the fundamental principles of justice, equity and good conscience.

217.   The amount by which AIG has thereby been unjustly enriched will be

-60-

1   proven at trial.

2                            **PRAYER FOR RELIEF**

3       WHEREFORE Plaintiffs, individually and on behalf of the Class, pray for relief
4   as follows:

5   A. certifying the Class or Classes identified herein and appointing Plaintiffs and
6       their counsel to represent the Class(es);

7   B. awarding Plaintiffs and the Class restitution and/or disgorgement of profits, in
8       amounts to be proven at trial, and other equitable relief as the Court deems
9       proper;

10  C. awarding Plaintiffs and the Class compensatory damages in an amount to be
11      determined at trial;

12  D. awarding Plaintiffs and the Class treble the amount of compensatory damages;

13  E. awarding Plaintiffs and the Class punitive damages in an amount to be
14      determined at trial;

15  F. imposing a constructive trust upon (i) all gains, from whatever source derived,
16      realized by Defendants as a result of Defendants' unlawful acts perpetrated on
17      Plaintiffs and the Class as alleged herein; and (ii) any other benefit realized by
18      Defendants as a consequence of the underreporting of WC premium to the State
19      of California;

20  G. enjoining Defendants, pursuant to California Business and Professions Code §
21      17203 and otherwise, from continuing to engage in business acts and practices,
22      or any of them, which are unlawful, unfair, or fraudulent, as alleged herein;

23  H. awarding Plaintiffs and the Class pre-judgment and post-judgment interest, as
24      well as reasonable attorneys' and expert-witness fees and other costs, pursuant
25      to California Code of Civil Procedure § 1021.5, and other statutes as may be
26      applicable; and

27  I. awarding such other and further relief as this Court may deem just and proper.

28

                                   -61-

1   Dated:  October 8, 2013.                    **SIMMONS BROWDER GIANARIS ANGELIDES**

2                                               **& BARNERD LLC**

3                                               By: _____

4                                                   Deborah R. Rosenthal
                                                    *Attorney for Plaintiffs*
5

6                           **DEMAND FOR JURY TRIAL**

7        Plaintiffs, on behalf of themselves and all others similarly situated, hereby

8   demand a trial by jury of all issues herein so triable.

9   Dated: October 8, 2013.                     **SIMMONS BROWDER GIANARIS ANGELIDES**

10                                              **& BARNERD LLC**

11

12                                              By: _____

13                                                  Deborah R. Rosenthal
                                                    *Attorney for Plaintiffs*
14

15  *Of Counsel:*

16  *Applications Pro Hac Vice* to be Submitted

17  Derek Y. Brandt *                           Drew E. Pomerance (#101239)
                                                dep@rpnalaw.com
18  dbrandt@simmonsfirm.com                     Nicholas P. Roxborough (#113540)
    John R. Phillips *                          npr@rpnalaw.com
19  jphillips@simmonsfirm.com                   **ROXBOROUGH POMERANCE NYE &**
    Emily J. Kirk *                             **ADREANI**
20  ekirk@simmonsfirm.com                       5820 Canoga Ave., Suite 250
                                                Woodland Hills, California 91367
21  **SIMMONS BROWDER GIANARIS**                Phone: (818) 992-9999 / Fax: (818) 992-
    **ANGELIDES & BARNERD LLC**                 9991
22  One Court Street

23  Alton, Illinois 62002

24  Phone: (618) 259-2222 / Fax: (618) 259-
    2251
25

26  Paul J. Hanly, Jr. *
    phanly@hanlyconroy.com
27  Andrea Bierstein *
    abierstein@hanlyconroy.com
28  Thomas I. Sheridan, III *

                                     -62-

1   tsheridan@hanlyconroy.com
    **HANLY CONROY BIERSTEIN SHERIDAN**
2   **FISHER & HAYES LLP**
3   112 Madison Avenue
    New York, New York 10016-7416
4   Phone: (212) 784-6400
5   Fax: (212) 213-5949

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-63-